IANNELLI ET AL. *v.* UNITED STATES

No. 73–64.   Argued December 17, 1974—Decided March 25, 1975

*James E. McLaughlin* argued the cause for petitioners. With him on the briefs were *Charles Alan Wright* and *Stanton D. Levenson.*

*Mark L. Evans* argued the cause for the United States. With him on the brief were *Solicitor General Bork* and *Assistant Attorney General Petersen.*

MR. JUSTICE POWELL delivered the opinion of the Court.

This case requires the Court to consider Wharton's Rule, a doctrine of criminal law enunciating an exception to the general principle that a conspiracy and the substantive offense that is its immediate end are discrete crimes for which separate sanctions may be imposed.

I

Petitioners were tried under a six-count indictment alleging a variety of federal gambling offenses. Each of the eight petitioners, along with seven unindicted coconspirators and six codefendants, was charged, *inter alia,*

with conspiring [1] to violate and violating 18 U. S. C. § 1955, a federal gambling statute making it a crime for five or more persons to conduct, finance, manage, supervise, direct, or own a gambling business prohibited by state law.[2] Each petitioner was convicted of both offenses,[3] and each was sentenced under both the substantive and conspiracy counts.[4] The Court of Appeals

[1] The general conspiracy statute under which this action was brought, 18 U. S. C. § 371, provides in pertinent part:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both. . . ."

[2] Title 18 U. S. C. § 1955 (1970 ed. and Supp. III) provides in pertinent part:

"(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

"(b) As used in this section—

"(1) 'illegal gambling business' means a gambling business which—

"(i) is a violation of the law of a State or political subdivision in which it is conducted;

"(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

"(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

"(2) 'gambling' includes but is not limited to pool-selling, book making, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein. . . ."

[3] Petitioner Iannelli additionally was convicted of mailing gambling paraphernalia, 18 U. S. C. § 1302, and using a fictitious name for the purpose of conducting unlawful bookmaking activities by means of the Postal Service. 18 U. S. C. § 1342.

[4] On the substantive counts, each petitioner was fined and sentenced to imprisonment and a subsequent term of probation. Each petitioner also was sentenced to an additional probationary period for the conspiracy conviction. Petitioner Iannelli's probationary

for the Third Circuit affirmed, finding that a recognized exception to Wharton's Rule permitted prosecution and punishment for both offenses, 477 F. 2d 999 (1973). We granted certiorari to resolve the conflicts caused by the federal courts' disparate approaches to the application of Wharton's Rule to conspiracies to violate § 1955. 417 U. S. 907 (1974). For the reasons now to be stated, we affirm.

## II

Wharton's Rule owes its name to Francis Wharton, whose treatise on criminal law identified the doctrine and its fundamental rationale:

> "When to the idea of an offense plurality of agents is logically necessary, conspiracy, which assumes the voluntary accession of a person to a crime of such a character that it is aggravated by a plurality of agents, cannot be maintained. . . . In other words, when the law says, 'a combination between two persons to effect a particular end shall be called, if the end be effected, by a certain name,' it is not lawful for the prosecution to call it by some other name; and when the law says, such an offense—*e. g.,* adultery—shall have a certain punishment, it is not lawful for the prosecution to evade this limitation by indicting the offense as conspiracy." 2 F. Wharton, Criminal Law § 1604, p. 1862 (12th ed. 1932).[5]

sentence is equal in length to that imposed for the substantive violations and is to be served concurrently. The probationary sentence imposed on each of the other petitioners for the conspiracy offense likewise is to be served concurrently with the probationary term imposed for the § 1955 violation. In their cases, however, the probationary term for the conspiracy offense exceeds that imposed for violation of § 1955.

[5] The current edition of Wharton's treatise states the Rule more simply:

"An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature

774

The Rule has been applied by numerous courts, state [6] and federal [7] alike. It also has been recognized by this Court,[8] although we have had no previous occasion carefully to analyze its justification and proper role in federal law.

The classic formulation of Wharton's Rule requires that the conspiracy indictment be dismissed before trial. Wharton's description of the Rule indicates that, where it is applicable, an indictment for conspiracy "cannot be maintained," *ibid.*, a conclusion echoed by Anderson's more recent formulation, see n. 5, *supra,* and by state-

as to necessarily require the participation of two persons for its commission." 1 R. Anderson, Wharton's Criminal Law and Procedure § 89, p. 191 (1957).

[6] See, *e. g., People* v. *Wettengel,* 98 Colo. 193, 198, 58 P. 2d 279, 281 (1935); *People* v. *Purcell,* 304 Ill. App. 215, 217, 26 N. E. 2d 153, 154 (1940); *Robinson* v. *State,* 184 A. 2d 814, 820 (Md. Ct. App. 1962).

[7] See, *e. g., United States* v. *New York C. & H. R. R. Co.,* 146 F. 298, 303–305 (CC SDNY 1906), aff'd, 212 U. S. 481 (1909); *United States* v. *Zeuli,* 137 F. 2d 845 (CA2 1943); *United States* v. *Dietrich,* 126 F. 659, 667 (CC Neb. 1904); *United States* v. *Sager,* 49 F. 2d 725, 727 (CA2 1931).

[8] The Court's most complete description of the Rule appears in *Gebardi* v. *United States,* 287 U. S. 112, 121–122 (1932):

"Of this class of cases we say that the substantive offense contemplated by the statute itself involves the same combination or community of purpose of two persons only which is prosecuted here as conspiracy.... [T]hose decisions ... hold, consistently with the theory upon which conspiracies are punished, that where it is impossible under any circumstances to commit the substantive offense without coöperative action, the preliminary agreement between the same parties to commit the offense is not an indictable conspiracy either at common law . . . or under the federal statute." (Citations omitted.)

See also *Pinkerton* v. *United States,* 328 U. S. 640, 642 (1946); *United States* v. *Katz,* 271 U. S. 354, 355 (1926); *United States* v. *Holte,* 236 U. S. 140, 145 (1915).

ments of this Court as well, see *Gebardi* v. *United States,* 287 U. S. 112, 122 (1932); *United States* v. *Katz,* 271 U. S. 354, 355 (1926). Federal courts earlier adhered to this literal interpretation and thus sustained demurrers to conspiracy indictments. See *United States* v. *New York C. & H. R. R. Co.,* 146 F. 298, 303–305 (CC SDNY 1906), aff'd, 212 U. S. 481 (1909); *United States* v. *Dietrich,* 126 F. 659 (CC Neb. 1904). More recently, however, some federal courts have differed over whether Wharton's Rule requires initial dismissal of the conspiracy indictment. In *United States* v. *Greenberg,* 334 F. Supp. 1092 (ND Ohio 1971), and *United States* v. *Figueredo,* 350 F. Supp. 1031 (MD Fla. 1972), rev'd *sub nom. United States* v. *Vaglica,* 490 F. 2d 799 (CA5 1974), cert. pending *sub nom. Scaglione* v. *United States,* No. 73–1503, District Courts sustained preliminary motions to dismiss conspiracy indictments in cases in which the prosecution also charged violation of § 1955. In this case, 339 F. Supp. 171 (WD Pa. 1972), and in *United States* v. *Kohne,* 347 F. Supp. 1178, 1186 (WD Pa. 1972), however, the courts held that the Rule's purposes can be served equally effectively by permitting the prosecution to charge both offenses and instructing the jury that a conviction for the substantive offense necessarily precludes conviction for the conspiracy.

Federal courts likewise have disagreed as to the proper application of the recognized "third-party exception," which renders Wharton's Rule inapplicable when the conspiracy involves the cooperation of a greater number of persons than is required for commission of the substantive offense. See *Gebardi* v. *United States, supra,* at 122 n. 6. In the present case, the Third Circuit concluded that the third-party exception permitted prosecution because the conspiracy involved more than the five persons required to commit the substantive offense, 477 F.

2d 999, a view shared by the Second Circuit, *United States* v. *Becker,* 461 F. 2d 230, 234 (1972), vacated and remanded on other grounds, 417 U. S. 903 (1974).[9] The Seventh Circuit reached the opposite result, however, reasoning that since § 1955 also covers gambling activities involving more than five persons, the third-party exception is inapplicable. *United States* v. *Hunter,* 478 F. 2d 1019, cert. denied, 414 U. S. 857 (1973).

The Courts of Appeals are at odds even over the fundamental question whether Wharton's Rule ever applies to a charge for conspiracy to violate § 1955. The Seventh Circuit holds that it does. *Hunter, supra; United States* v. *Clarke,* 500 F. 2d 1405 (1974), cert. denied, *post,* p. 925. The Fourth and Fifth Circuits, on the other hand, have declared that it does not. *United States* v. *Bobo,* 477 F. 2d 974 (CA4 1973), cert. pending *sub nom. Gray* v. *United States,* No. 73–231; *United States* v. *Pacheco,* 489 F. 2d 554 (CA5 1974), cert. pending, No. 73–1510.

As this brief description indicates, the history of the application of Wharton's Rule to charges for conspiracy to violate § 1955 fully supports the Fourth Circuit's observation that "rather than being a rule, [it] is a concept, the confines of which have been delineated in widely diverse fashion by the courts." *United States* v. *Bobo, supra,* at 986. With this diversity of views in mind, we turn to an examination of the history and purposes of the Rule.

---

[9] This appears to represent a departure from the Second Circuit's earlier view. The conspiracy charge dismissed in *United States* v. *Sager,* 49 F. 2d 725 (CA2 1931), involved agreements by more than two persons to commit substantive offenses that could have been consummated by only two. In that case, however, the Second Circuit determined that Wharton's Rule precluded indictment for both offenses.

## III

### A

Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes. Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act. See, e. g., United States v. Feola, ante, p. 671; Pinkerton v. United States, 328 U. S. 640, 644 (1946); Braverman v. United States, 317 U. S. 49, 53 (1942).[10] Unlike some crimes that arise in a single transaction, see Heflin v. United States, 358 U. S. 415 (1959); Prince v. United States, 352 U. S. 322 (1957), the conspiracy to commit an offense and the subsequent commission of that crime normally do not merge into a single punishable act. Pinkerton v. United States, supra, at 643.[11] Thus, it is well recognized that in most cases separate sentences can be imposed for the conspiracy to

[10] The agreement need not be shown to have been explicit. It can instead be inferred from the facts and circumstances of the case. See Direct Sales Co. v. United States, 319 U. S. 703, 711–713 (1943). In some cases reliance on such evidence perhaps has tended to obscure the basic fact that the agreement is the essential evil at which the crime of conspiracy is directed. See Note, Developments in the Law—Criminal Conspiracy, 72 Harv. L. Rev. 920, 933–934 (1959). Nonetheless, agreement remains the essential element of the crime, and serves to distinguish conspiracy from aiding and abetting which, although often based on agreement, does not require proof of that fact, see Pereira v. United States, 347 U. S. 1, 11 (1954), and from other substantive offenses as well. Id., at 11–12.

[11] This was not always the case. Under the early common law, a conspiracy, which was a misdemeanor, was considered to merge into the completed felony that was its object. That rule was based on the significant procedural differences then existing between felony and misdemeanor trials. As the procedural distinctions diminished, the merger concept lost its force and eventually disappeared. See generally Callanan v. United States, 364 U. S. 587, 589–590 (1961), and sources cited therein.

do an act and for the subsequent accomplishment of that end. *Feola, supra; Callanan* v. *United States,* 364 U. S. 587 (1961); *Pinkerton, supra; Carter* v. *McClaughry,* 183 U. S. 365 (1902). Indeed, the Court has even held that the conspiracy can be punished more harshly than the accomplishment of its purpose. *Clune* v. *United States,* 159 U. S. 590 (1895).

The consistent rationale of this long line of decisions rests on the very nature of the crime of conspiracy. This Court repeatedly has recognized that a conspiracy poses distinct dangers quite apart from those of the substantive offense.

> "This settled principle derives from the reason of things in dealing with socially reprehensible conduct: collective criminal agreement—partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish. Nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked. Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed. In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise." *Callanan* v. *United States, supra,* at 593–594.

As Mr. Justice Jackson, no friend of the law of conspiracy, see *Krulewitch* v. *United States,* 336 U. S. 440, 445

(1949) (concurring opinion), observed: "The basic rationale of the law of conspiracy is that a conspiracy may be an evil in itself, independently of any other evil it seeks to accomplish." *Dennis* v. *United States,* 341 U. S. 494, 573 (1951) (concurring opinion). See also *United States* v. *Rabinowich,* 238 U. S. 78, 88 (1915).

## B

The historical difference between the conspiracy and its end has led this Court consistently to attribute to Congress "a tacit purpose—in the absence of any inconsistent expression—to maintain a long-established distinction between offenses essentially different; a distinction whose practical importance in the criminal law is not easily overestimated." *Ibid.; Callanan, supra,* at 594. Wharton's Rule announces an exception to this general principle.

The Rule traces its origin to the decision of the Pennsylvania Supreme Court in *Shannon* v. *Commonwealth,* 14 Pa. 226 (1850), a case in which the court ordered dismissal of an indictment alleging conspiracy to commit adultery that was brought after the State had failed to obtain conviction for the substantive offense. Prominent among the concerns voiced in the *Shannon* opinion is the possibility that the State could force the defendant to undergo subsequent prosecution for a lesser offense after failing to prove the greater. The *Shannon* court's holding reflects this concern, stating that "where concert is a constituent part of the act to be done, as it is in fornication and adultery, *a party acquitted of the major cannot be indicted of the minor." Id.,* at 227–228.

Wharton's treatise first reported the case as one based on principles of double jeopardy, see F. Wharton, Criminal Law 198 (2d ed. 1852), and indicated that it was

limited to that context.[12]  Subsequently, however, Wharton came to view the principle as one of broader application.  The seventh edition of Wharton's treatise reported the more general rule which is repeated in similar form today.  *Shannon* v. *Commonwealth* was said to be an application of the principle rather than its source. 2 F. Wharton, Criminal Law 634 (7th ed. 1874).

This Court's previous discussions of Wharton's Rule have not elaborated upon its precise role in federal law. In most instances, the Court simply has identified the Rule and described it in terms similar to those used in Wharton's treatise.  But in *United States* v. *Holte,* 236 U. S. 140 (1915), the sole case in which the Court felt compelled specifically to consider the applicability of Wharton's Rule, it declined to adopt an expansive definition of its scope.  In that case, Wharton's Rule was advanced as a bar to prosecution of a female for conspiracy to violate the Mann Act.  Rejecting that contention, the Court adopted a narrow construction of the Rule that focuses on the statutory requirements of the substantive offense rather than the evidence offered to prove those elements at trial:

> "The substantive offence might be committed without the woman's consent, for instance, if she were drugged or taken by force.  Therefore the decisions that it is impossible to turn the concurrence

---

[12] The sixth edition of Wharton's treatise reported the principle of *Shannon* v. *Commonwealth,* 14 Pa. 226 (1850), in the following manner:

"It has been recently held in Pennsylvania, that no indictment lies for a conspiracy between a man and a woman to commit adultery. It was said by the learned judge who tried the case, that where concert is the essential ingredient to the act, there is no conspiracy; but from the peculiar circumstances of the case, it is clear that this authority cannot be used beyond the class of cases to which it belongs."  3 F. Wharton, Criminal Law § 2321, p. 78 (6th ed. 1868).

necessary to effect certain crimes such as bigamy or duelling into a conspiracy to commit them do not apply." *Id.*, at 145.

Wharton's Rule first emerged at a time when the contours of the law of conspiracy were in the process of active formulation. The general question whether the conspiracy merged into the completed felony offense remained for some time a matter of uncertain resolution.[13] That issue is now settled, however, and the Rule currently stands as an exception to the general principle that a conspiracy and the substantive offense that is its im-

------

[13] As previously noted, the general rule in the early common law was that the conspiracy merged with the felony upon consummation of the latter. Thus, an indictment that charged conspiracy in terms indicating that the felony actually had been committed was considered invalid. See H. Carson, The Law of Criminal Conspiracies and Agreements as Found in the American Cases, published in R. Wright, The Law of Criminal Conspiracies and Agreements 191 (1887). When it was clear that the felony had been perpetrated, Carson considered a conspiracy indictment to be "futile." *Ibid.*

Wharton's treatises likewise recognized the difficulty posed by the concept of merger of the felony and the conspiracy to commit that offense. The seventh edition of the treatise notes that "[t]he technical rule of the old common law pleaders, that a misdemeanor always sinks into a felony when the two meet" had been applied to the law of conspiracy. 2 F. Wharton, Criminal Law § 2294, p. 637 (7th ed. 1874). Wharton was more critical of this concept than Carson, however, observing that the rule was one "with very little substantial reason." *Ibid.* He discussed approvingly English and American cases that were beginning to reflect a narrow view of the merger doctrine in the law of conspiracy and to indicate that the conspiracy might be pursued as an independent offense even when the felony was committed. *Id.*, at 638–639. Wharton subsequently indicated that the proper sentencing disposition in a case of conviction for both offenses was to apportion the penalty between the two. 2 F. Wharton, Criminal Law § 1344, p. 198 (8th ed. 1880), quoting from *R.* v. *Button,* 11 Q. B. (Ad. & E., N. S.) *929, 116 Eng. Rep. 720 (1848).

mediate end do not merge upon proof of the latter. See *Pinkerton* v. *United States,* 328 U. S. 640 (1946). If the Rule is to serve a rational purpose in the context of the modern law of conspiracy, its role must be more precisely identified.

## C

This Court's prior decisions indicate that the broadly formulated Wharton's Rule does not rest on principles of double jeopardy, see *Pereira* v. *United States,* 347 U. S. 1, 11 (1954); *Pinkerton, supra,* at 643–644.[14] Instead, it has current vitality only as a judicial presumption, to be applied in the absence of legislative intent to the contrary. The classic Wharton's Rule offenses—adultery, incest, bigamy, duelling—are crimes that are characterized by the general congruence of the agreement and the completed substantive offense. The parties to the agreement are the only persons who participate in commission of the substantive offense,[15] and the immediate conse-

---

[14] In a proper case, this Court's opinion in *Ashe* v. *Swenson,* 397 U. S. 436 (1970), can afford protection against reprosecution following acquittal, a concern expressed by the Pennsylvania Supreme Court in *Shannon.*

[15] An exception to the Rule generally is thought to apply in the case in which the conspiracy involves more persons than are required for commission of the substantive offense. For example, while the two persons who commit adultery cannot normally be prosecuted both for that offense and for conspiracy to commit it, the third-party exception would permit the conspiracy charge where a "matchmaker"—the third party—had conspired with the principals to encourage commission of the substantive offense. See 1 R. Anderson, Wharton's Criminal Law and Procedure § 89, p. 193 (1957); *State* v. *Clemenson,* 123 Iowa 524, 526, 99 N. W. 139 (1904). The rationale supporting this exception appears to be that the addition of a third party enhances the dangers presented by the crime. Thus, it is thought that the legislature would not have intended to preclude punishment for a combination of greater dimension than that required to commit the substantive offense. See

quences of the crime rest on the parties themselves rather than on society at large. See *United States v. Bobo,* 477 F. 2d, at 987. Finally, the agreement that attends the substantive offense does not appear likely to pose the distinct kinds of threats to society that the law of conspiracy seeks to avert.[16] It cannot, for

---

Comment, Gambling Under the Organized Crime Control Act: Wharton's Rule and the Odds on Conspiracy, 59 Iowa L. Rev. 452, 460 (1973); Note, Developments in the Law, *supra,* n. 10, at 956.

Our determination that Congress authorized prosecution and conviction for both offenses in all cases, see Part IV, *infra,* makes it unnecessary to decide whether the exception to Wharton's Rule could properly be applied to conspiracies to violate § 1955 involving more than five persons. See *supra,* at 775. We note, however, that the statute and its legislative history seem to suggest that it could not. By its terms, § 1955 reaches gambling activities involving "five or more persons." Moreover, the legislative history of the statute indicates that Congress assumed that it would generally be applied in cases in which more than the statutory minimum number were involved. See n. 21, *infra.* It thus would seem anomalous to conclude that Congress intended the substantive offense to subsume the conspiracy in one case but not in the other.

[16] Commentators who have examined the Rule have identified its major underlying premise to be that agreements to commit crimes to which it applies do not seem to present the distinct dangers that the law of conspiracy seeks to avert. See Comment, Gambling Under the Organized Crime Control Act, *supra,* n. 15, at 456; Note, Developments in the Law, *supra,* n. 10, at 955. The same consideration is also apparent in *Shannon* v. *Commonwealth,* 14 Pa., at 227. As Chief Justice Gibson there noted:

"If confederacy constituted conspiracy, without regard to the quality of the act to be done, a party might incur the guilt of it by having agreed to be the passive subject of a battery, which did not involve him in a breach of the peace. By such preconcerted encounters, it has been said, a reputation for prowess is sometimes purchased by gentlemen of the fancy. In the same way there might be a conspiracy to commit suicide by drowning or hanging in concert, according to the method of the Parisian roués, though no one could be indicted if the felony were committed. It may be said, such conspiracies are ridiculous and improbable. But nothing is

example, readily be assumed that an agreement to commit an offense of this nature will produce agreements to engage in a more general pattern of criminal conduct. Cf. *Callanan* v. *United States,* 364 U. S. 587 (1961); *United States* v. *Rabinowich,* 238 U. S. 78 (1915).

The conduct proscribed by § 1955 is significantly different from the offenses to which the Rule traditionally has been applied. Unlike the consequences of the classic Wharton's Rule offenses, the harm attendant upon the commission of the substantive offense is not restricted to the parties to the agreement. Large-scale gambling activities seek to elicit the participation of additional persons— the bettors—who are parties neither to the conspiracy nor to the substantive offense that results from it. Moreover, the parties prosecuted for the conspiracy need not be the same persons who are prosecuted for commission of the substantive offense. An endeavor as complex as a large-scale gambling enterprise might involve persons who have played appreciably different roles, and whose level of culpability varies significantly. It might, therefore, be appropriate to prosecute the owners and organizers of large-scale gambling operations both for the conspiracy and for the substantive offense but to prosecute the lesser participants only for the substantive offense. Nor can it fairly be maintained that agreements to enter into large-scale gambling activities are not likely to generate additional agreements to engage in other criminal endeavors. As shown in Part IV hereof, the legislative history of § 1955 provides documented testimony to the contrary.

more ridiculous than a conspiracy to commit adultery—were we not bound to treat it with becoming gravity, it might provoke a smile— or more improbable than that the parties would deliberately postpone an opportunity to appease the most unruly of their appetites. These are subtle premises for a legal conclusion; but their subtilty is in the analysis of the principle, not in the manner of treating it."

Wharton's Rule applies only to offenses that *require* concerted criminal activity, a plurality of criminal agents. In such cases, a closer relationship exists between the conspiracy and the substantive offense because *both* require collective criminal activity. The substantive offense therefore presents some of the same threats that the law of conspiracy normally is thought to guard against, and it cannot automatically be assumed that the Legislature intended the conspiracy and the substantive offense to remain as discrete crimes upon consummation of the latter.[17] Thus, absent legislative intent to the

---

[17] The test articulated in *Blockburger* v. *United States,* 284 U. S. 299 (1932), serves a generally similar function of identifying congressional intent to impose separate sanctions for multiple offenses arising in the course of a single act or transaction. In determining whether separate punishment might be imposed, *Blockburger* requires that courts examine the offenses to ascertain "whether each provision requires proof of a fact which the other does not." *Id.,* at 304. As *Blockburger* and other decisions applying its principle reveal, see, *e. g., Gore* v. *United States,* 357 U. S. 386 (1958); *American Tobacco Co.* v. *United States,* 328 U. S. 781, 788–789 (1946), the Court's application of the test focuses on the statutory elements of the offense. If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes. See *Gore* v. *United States, supra.* We think that the *Blockburger* test would be satisfied in this case. The essence of the crime of conspiracy is agreement, see, *e. g., Pereira* v. *United States,* 347 U. S., at 11–12; *Braverman* v. *United States,* 317 U. S. 49, 53 (1942); *Morrison* v. *California,* 291 U. S. 82, 92–93 (1934), an element not contained in the statutory definition of the § 1955 offense. In a similar fashion, proof of violation of § 1955 requires establishment of a fact not required for conviction for conspiracy to violate that statute. To establish violation of § 1955 the prosecution must prove that the defendants actually did "conduct, finance, manage, supervise, direct, or own all or part of an illegal gambling business." § 1955 (a). The overt act requirement in the conspiracy statute can be satisfied much more easily. Indeed, the act can be innocent in nature, provided it furthers the purpose of the conspiracy. See

contrary, the Rule supports a presumption that the two merge when the substantive offense is proved.[18]

But a legal principle commands less respect when extended beyond the logic that supports it. In this case, the significant differences in characteristics and consequences of the kinds of offenses that gave rise to Wharton's Rule and the activities proscribed by § 1955 counsel against attributing significant weight to the presumption the Rule erects. More important, as the Rule is essentially an aid to the determination of legislative intent, it must defer to a discernible legislative judgment. We turn now to that inquiry.

## IV

The basic purpose of the Organized Crime Control Act of 1970, Pub. L. No. 91–452, 84 Stat. 922, 923, was "to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." The content of the Act reflects the dedication with which the Legislature pursued this purpose. In addition to enacting provisions to facilitate the discovery and proof of organized criminal activities, Congress passed a number of relatively severe penalty provisions. For example, Title X, codified in 18 U. S. C. §§ 3575–

---

*Yates* v. *United States,* 354 U. S. 298, 333–334 (1957); *Braverman, supra.*

[18] We do not consider initial dismissal of the conspiracy charge to be required in such a case. When both charges are considered at a single trial, the real problem is the avoidance of dual punishment. This problem is analogous to that presented by the threat of conviction for a greater and a lesser included offense, and should be treated in a similar manner. 8 J. Moore, Federal Practice ¶ 31.03 (2d ed. 1975). Cf. Comment, Gambling Under the Organized Crime Control Act, *supra,* n. 15, at 461–464.

3578, identifies for harsher sentencing treatment certain "dangerous special offenders," among them persons who initiate, direct, or supervise patterns of criminal conduct or conspiracies to engage in such conduct, and persons who derive substantial portions of their income from those activities.[19] § 3575 (e).

Major gambling activities were a principal focus of congressional concern. Large-scale gambling enterprises were seen to be both a substantive evil and a source of funds for other criminal conduct. See S. Rep. No. 91–617, pp. 71–73 (1969).[20] Title VIII thus was enacted

---

[19] Additionally, Title IX, codified in 18 U. S. C. §§ 1961–1968, seeks to prevent the infiltration of legitimate business operations affecting interstate commerce by individuals who have obtained investment capital from a pattern of racketeering activity. See § 1962. Title IX provides penalties for such conduct, § 1963, and also affords civil remedies for its prevention and correction, including provisions permitting United States district courts to require divestiture of interests so acquired and impose reasonable restrictions on the future investment activities of persons identified by the statute. § 1964.

[20] "Law enforcement officials agree almost unanimously that gambling is the greatest source of revenue for organized crime. It ranges from lotteries, such as 'numbers' . . . to off-track horse betting . . . . In large cities where organized criminal groups exist, very few of the gambling operators are independent of a large organization. . . .

"Most large-city gambling is established or controlled by organized crime members through elaborate hierarchies.

.    .    .    .    .

"There is no accurate way of ascertaining organized crime's gross revenue from gambling in the United States. Estimates of the annual intake have varied from $7 to $50 billion. Legal betting at racetracks reaches a gross annual figure of almost $5 billion, and most enforcement officials believe that illegal wagering on horse races, lotteries, and sporting events totals at least $20 billion each year. Analysis of organized criminal betting operations indicates that the profit is as high as one-third of gross revenue—or $6 to $7 billion each year. While the Commission cannot judge the accuracy of

"to give the Federal Government a new substantive weapon, a weapon which will strike at organized crime's principal source of revenue: illegal gambling." *Id.,* at 71. In addition to declaring that certain gambling activities violate federal as well as state law, 18 U. S. C. § 1955, Title VIII provides new penalties for conspiracies to obstruct state law enforcement efforts for the purpose of facilitating the conduct of these activities. 18 U. S. C. § 1511.

In drafting the Organized Crime Control Act of 1970, Congress manifested its clear awareness of the distinct nature of a conspiracy and the substantive offenses that might constitute its immediate end. The identification of "special offenders" in Title X speaks both to persons who commit specific felonies during the course of a pattern of criminal activity and to those who enter into conspiracies to engage in patterns of criminal conduct. 18 U. S. C. § 3575 (e). And Congress specifically utilized the law of conspiracy to discourage organized crime's corruption of state and local officials for the purpose of facilitating gambling enterprises. 18 U. S. C. § 1511.[21]

---

these figures, even the most conservative estimates place substantial capital in the hands of organized crime leaders." Report of the President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 188–189 (1967).

[21] The Senate initially contemplated a more sweeping prohibition. The Senate version of that provision declared it unlawful for "two or more persons to participate in a scheme to obstruct the enforcement of the criminal laws of a State or political subdivision thereof, with the intent to facilitate an illegal gambling business." S. 30, 91st Cong., 1st Sess., § 802 (1969). Discussions in the Senate hearings reveal that this language was intentionally chosen to obtain the broadest possible coverage for that provision. It was hoped that prohibiting "schemes" rather than "conspiracies" would enable the prosecution to obtain convictions in cases in which they might be unable to establish the requisite knowledge of the major members of the enterprise required for a conspiracy conviction. See Hear-

But the § 1955 definition of "gambling activities" pointedly avoids reference to conspiracy or to agreement, the essential element of conspiracy. Moreover, the limited § 1955 definition is repeated in identifying the reach of § 1511, a provision that specifically prohibits conspiracies. Viewed in this context, and in light of the numerous references to conspiracies throughout the extensive consideration of the Organized Crime Control Act, we think that the limited congressional definition of "gambling activities" in § 1955 is significant. The Act is a carefully crafted piece of legislation. Had Congress intended to foreclose the possibility of prosecuting conspiracy offenses under § 371 by merging them into prosecutions under § 1955, we think it would have so indicated explicitly. It chose instead to define the substantive offense punished by § 1955 in a manner that fails specifically to invoke the concerns which underlie the law of conspiracy.

Nor do we find merit to the argument that the congressional requirement of participation of "five or more persons" as an element of the substantive offense under § 1955 represents a legislative attempt to merge the conspiracy and the substantive offense into a single crime. The history of the Act instead reveals that this requirement was designed to restrict federal intervention to cases in which federal interests are substantially implicated. The findings accompanying Title VIII, see note

---

ings on S. 30 before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 91st Cong., 1st Sess., 397 (1969). The Senate version was criticized in hearings before the House Judiciary Subcommittee, where it was asserted that this language was too vague. See Hearings on S. 30 before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 2d Sess., ser. 27, p. 498 (1970). The bill reported from the House Judiciary Committee prohibited conspiracies rather than schemes, and that version subsequently was enacted into law.

following 18 U. S. C. § 1511, would appear to support the assertion of federal jurisdiction over all illegal gambling activities, cf. *Heart of Atlanta Motel* v. *United States,* 379 U. S. 241, 258 (1964); *Katzenbach* v. *McClung,* 379 U. S. 294 (1964). Congress did not, however, choose to exercise its power to the fullest. Recognizing that gambling activities normally are matters of state concern, Congress indicated a desire to extend federal criminal jurisdiction to reach only "those who are engaged in an illicit gambling business of major proportions." S. Rep. No. 91–617, p. 73 (1969). It accordingly conditioned the application of § 1955 on a finding that the gambling activities involve five or more persons and that they remain substantially in operation in excess of 30 days or attain gross revenues of $2,000 in a single day. 18 U. S. C. § 1955 (b)(1)(iii) (1970 ed. and Supp. III).[22] Thus the requirement of "concerted activity" in § 1955 reflects no more than a concern to avoid federal prosecution of small-scale gambling activities which pose a limited threat to federal interests and normally can be combated effectively by local law enforcement efforts.

Viewed in the context of this legislation, there simply is no basis for relying on a presumption to reach a result so

---

[22] Congress was aware that the imposition of this requirement would have the practical effect of limiting federal criminal jurisdiction to even larger gambling enterprises than those identified in § 1955.

"It is anticipated that cases in which this standard can be met will ordinarily involve business-type gambling operations of considerably greater magnitude than this definition would indicate, . . . because it is usually possible to prove only a relatively small proportion of the total operations of a gambling enterprise. Thus, the legislation would in practice not apply to gambling that is sporadic or of insignificant monetary proportions. It will reach only those who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be a matter of national concern." S. Rep. No. 91–617, p. 73 (1969).

plainly at odds with congressional intent. We think it evident that Congress intended to retain each offense as an "independent curb" available for use in the strategy against organized crime. *Gore* v. *United States,* 357 U. S. 386, 389 (1958). We conclude, therefore, that the history and structure of the Organized Crime Control Act of 1970 manifest a clear and unmistakable legislative judgment that more than outweighs any presumption of merger between the conspiracy to violate § 1955 and the consummation of that substantive offense.

## V

In expressing these conclusions we do not imply that the distinct nature of the crimes of conspiracy to violate and violation of § 1955 should prompt prosecutors to seek separate convictions in every case, or judges necessarily to sentence in a manner that imposes an additional sanction for conspiracy to violate § 1955 and the consummation of that end. Those decisions fall within the sound discretion of each, and should be rendered in accordance with the facts and circumstances of a particular case. We conclude only that Congress intended to retain these traditional options. Neither Wharton's Rule nor the history and structure of the Organized Crime Control Act of 1970 persuade us to the contrary.

*Affirmed.*

Mr. Justice Douglas, dissenting.

The eight petitioners in this case were tried, along with other codefendants, on a multiple-count indictment alleging the commission of various offenses in connection with gambling activities. Petitioners were convicted both of participating in an "illegal gambling business," 18 U. S. C. § 1955, and of conspiring to commit that offense, 18 U. S. C. § 371. On both statutory and constitutional

grounds, I would hold that the simultaneous convictions under both statutes cannot stand.

I

In my view the Double Jeopardy Clause forbids simultaneous prosecution under §§ 1955 and 371. Wharton's Rule in its original formulation was rooted in the double jeopardy concern of avoiding multiple prosecutions. *Carter* v. *McClaughry*, 183 U. S. 365, 394–395 (1902), and later cases [1] confine the double jeopardy protection to prohibiting cumulative punishment of offenses that are absolutely identical, but I would not extend those cases so as to permit both convictions in this case to stand.

The evidence against petitioners consisted largely of conversations that involved gambling transactions. The Government's theory of the case was that petitioner Iannelli was the central figure in the enterprise who, through other employees or agents, received bets, arranged payoffs, and parceled out commissions. The evidence established, in the Government's view, "syndicated gambling," the kind of activity proscribed by § 1955. The very same evidence was relied upon to establish the conspiracy—a conspiracy, apparently, enduring as long as the substantive offense continued, and provable by the same acts that established the violation of § 1955. Thus the very same transactions among the defendants gave rise to criminal liability under both statutes.

Under these circumstances, I would require the prosecutor to choose between § 371 and § 1955 as the instrument for criminal punishment. See my dissenting opinion in *Gore* v. *United States*, 357 U. S. 386, 395–397 (1958), where the Government brought three charges based on

---

[1] *E. g., Morgan* v. *Devine*, 237 U. S. 632, 641 (1915); *Pinkerton* v. *United States*, 328 U. S. 640, 643–644 (1946); *Gore* v. *United States*, 357 U. S. 386 (1958).

a single sale of narcotics. To permit this kind of multiple prosecution is to place in the hands of the Government an arbitrary power to increase punishment. Here, as in *Gore,* I would require the prosecutor to observe the " ' "fundamental rule of law that out of the same facts a series of charges shall not be preferred," ' " *id.,* at 396, quoting *Regina* v. *Elrington,* 9 Cox C. C. 86, 90, 1 B & S 688, 696 (1861).

## II

Apart from my views of the Double Jeopardy Clause, I would reverse on the additional ground that Congress did not intend to permit simultaneous convictions under §§ 371 and 1955 for the same acts. The rule that a conspiracy remains separable from the completed crime, thus permitting simultaneous conviction for both, rests on the assumption that the act of conspiring presents special dangers the Legislature did not address in defining the substantive crime and that are not adequately checked by its prosecution.[2] But the rule of separability is one of construction only, an aid to discerning legislative intent. Wharton's Rule teaches that where the substantive crime itself is aimed at the evils traditionally addressed by the law of conspiracy, separability should not be found unless the clearest legislative statement demands it. In my view this case fits the rationale of Wharton's Rule, and there is no legislative

---

[2] See *United States* v. *Rabinowich,* 238 U. S. 78, 88 (1915):

"For two or more to confederate and combine together to commit or cause to be committed a breach of the criminal laws, is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime. It involves deliberate plotting to subvert the laws, educating and preparing the conspirators for further and habitual criminal practices. And it is characterized by secrecy, rendering it difficult of detection, requiring more time for its discovery, and adding to the importance of punishing it when discovered."

statement justifying the inference that Congress intended to permit multiple convictions.

Title 18 U. S. C. § 1955, which creates the substantive offense, is aimed at a particular form of concerted activity. The provision was added by the Organized Crime Control Act of 1970, Pub. L. 91–452, 84 Stat. 922. This statute, as its title indicates, was directed at criminal activity carried out by large organizations, described by Congress as hierarchical in structure and as having their own system of law and independent enforcement institutions.[3] Most of the Act was devoted to altering the powers and procedures of law enforcement institutions to deal with existing offenses.[4] Only a few provisions added new prohibitions of primary conduct. Among these was Title VIII, which appears under the heading "Syndicated Gambling." Section 1955, included in Title VIII, prohibits participation in an "illegal gambling business," which is defined as one involving at least five persons who "conduct, finance, manage, supervise, direct, or own all or part of" the enterprise. Congress thought that federal law enforcement resources would be used to combat large enterprises, "so continuous and so substantial as to be a matter of national concern."[5]

Conviction under § 1955 satisfies, in my view, the social concerns that punishment for conspiracy is supposed to address. The provision was aimed not at the single unlawful wager but at "syndicated gambling." Congress viewed this activity as harmful because on such a scale

---

[3] See S. Rep. No. 91–617, pp. 36–41 (1969) (hereinafter Senate Report).

[4] Title I authorized the convening of special grand juries, and Titles II through VI were aimed at enhancing the prosecutor's ability to obtain testimony of witnesses. Title X provides for the enhancement of sentences of designated offenders.

[5] Senate Report 73.

it was thought to facilitate other forms of illicit activity, one of the reasons traditionally advanced for the separate prosecution of conspiracies. Where § 1955 has been violated, the elements of conspiracy will almost invariably be found. The enterprises to which Congress was referring in § 1955 cannot, as a practical matter, be created and perpetuated without the agreement and coordination that characterize conspiracy. Section 1955 is thus most sensibly viewed as a statute directed at conspiracy in a particular context.

All this the majority seems to concede when it acknowledges a "presumption that the two [crimes] merge when the substantive offense is proved." *Ante,* at 786. But the majority concludes that simultaneous conviction is authorized because it is not "explicitly excluded." *Ante,* at 789. The majority thus implicitly concedes that the statute is silent on the matter of simultaneous conviction.[6] To infer from silence an intention to permit multiple punishment is, I think, a departure from the "presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment," *Bell* v. *United States,* 349 U. S. 81, 83 (1955). I would adhere to that principle, which is but a specific application of the "ancient rule that a criminal statute is to be strictly construed," *Callanan* v. *United States,* 364 U. S. 587, 602 (1961) (STEWART, J., dissenting).

The majority suggests, *ante,* at 784, that § 371 may be

---

[6] By the application of 18 U. S. C. § 1511 a defendant may be found guilty both of violating § 1955 and of conspiracy to "obstruct the enforcement of the' criminal laws of a State or political subdivision thereof, with the intent to facilitate an illegal gambling business." An essential element of the narrowly defined § 1511 conspiracy is participation of an "official or employee" of a governmental unit. That requirement is not satisfied here, and thus § 1511 is inapplicable.

used to enhance the punishment for a § 1955 offense committed by "owners and organizers" of the enterprise, leaving prosecution under § 1955 alone for "lesser participants." But this is the Court's suggestion, not that of Congress. Congress recognized that syndicated operations would include persons having varying degrees of authority [7] and set a maximum penalty accordingly.

Congress did address the matter of sentence enhancement in Title X of the Act, codified in 18 U. S. C. §§ 3575–3578. These provisions authorize augmented punishment, to a maximum of imprisonment for 25 years, for felonies committed by a "dangerous special offender," § 3575 (b). Some of the procedural obstacles to sentence enhancement under these provisions, and the constitutional questions raised thereby, are now being litigated in the District Courts.[8] Nothing in Title X, however, supports the majority's position. "Special offender," as defined in § 3575 (e), includes a defendant convicted of a felony that was committed in furtherance of a "conspiracy . . . to engage in a pattern of conduct criminal under applicable laws of any jurisdiction . . . ." The application of this language to a § 1955 conviction is not readily apparent. Though "pattern of criminal conduct" is not defined in the statute, it is clear from the legislative history that Congress was focusing on repeated offenders.[9] An enterprise proscribed by § 1955 will involve repeated transactions; yet I have

---

[7] See Senate Report 40–41; H. R. Rep. No. 91–1549, p. 53 (1970).

[8] See *United States* v. *Kelly,* 384 F. Supp. 1394 (WD Mo. 1974); *United States* v. *Duardi,* 384 F. Supp. 874 (WD Mo. 1974); *United States* v. *Edwards,* 379 F. Supp. 617 (MD Fla. 1974).

[9] Repeated offenders included both those having prior convictions and those who, by virtue of particular positions in a criminal organization, had committed previously undetected crimes. Senate Report 87–88; H. R. Rep. No. 91–1549, *supra,* at 61–62.

doubt that Congress intended that proof of a § 1955 offense alone would constitute a "pattern."

In any case, the special procedures of Title X are at odds with any notion that § 371 would be used to enhance punishment. Sentence may be increased under § 3575 only if the judge makes special findings that the defendant is "dangerous," § 3575 (f). And § 3575 (a) requires that "[i]n no case shall the fact that the defendant is alleged to be a dangerous special offender be an issue upon the trial . . . [or] be disclosed to the jury . . . ." The trial judge must state the reasons for enhancing sentence, § 3575 (b), and there are provisions for appellate review, § 3576. Among the purposes of Title X was "improving the rationality, consistency, and effectiveness of sentencing by testing concepts of limiting and guiding sentencing discretion," [10] a purpose undercut by authorizing the prosecutor to add charges under § 371. If, as the majority says, the statute is a "carefully crafted piece of legislation," *ante,* at 789, we should leave the differentiation of offenders to the scheme Congress expressly created.

Conspiracy, if charged in a § 1955 prosecution, should be charged as a preparatory offense that merges with the completed crime, and considered by the jury only if it first acquits the defendant of the § 1955 charge. The trial judge did allude to this use of the conspiracy charge,[11] and he did suggest that the jury might defer

---

[10] Senate Report 83.

[11] The trial judge explained:

"It is theoretically possible that two people could conspire to form a business of five [participants] or more. It would be theoretically possible, too, that if the business were underway and only reached a total of four, . . . there would be no violation of Section 1955, but there still could be a conspiracy charge on the part of those who planned the agreement to ultimately make a business of five, even though they never actually reached five." Tr. 2505.

consideration of the conspiracy count until after deliberation of the § 1955 charge. But that was only a suggestion; the instructions permitted convictions on both charges. The error cannot be corrected merely by vacating the sentences on the conspiracy count; it requires a new trial. We so held in *Milanovich* v. *United States,* 365 U. S. 551 (1961), where the trial judge had permitted the jury to convict the defendant both of larceny and of receiving stolen goods. We held that simultaneous conviction of both offenses was impermissible and that the proper remedy was a new trial:

> "[T]here is no way of knowing whether a properly instructed jury would have found the wife guilty of larceny or of receiving (or, conceivably, of neither)." *Id.,* at 555.

I would accordingly reverse these convictions.

MR. JUSTICE STEWART and MR. JUSTICE MARSHALL join Part II of this opinion.

MR. JUSTICE BRENNAN, dissenting.

In *Bell* v. *United States,* 349 U. S. 81 (1955), this Court held that in criminal cases "[w]hen Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity." *Id.,* at 83. I agree with MR. JUSTICE DOUGLAS that "[§] 1955 is . . . most sensibly viewed as a statute directed at conspiracy in a particular context," *ante,* at 795, and that the statute is at best silent on whether punishment for both the substantive crime and conspiracy was intended. In this situation, I would invoke *Bell*'s rule of lenity. I therefore dissent.