**UNITED STATES of America, Appellee,**

v.

**Robert Earl WARD, Jr. a/k/a "Buck" Ward, Appellant.**

**No. 81–5162.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 11, 1981.

Decided Feb. 19, 1982.

Rehearing and Rehearing En Banc Denied April 14, 1982.

Roger W. Smith, Raleigh, N. C. (Wade M. Smith, Elizabeth F. Kuniholm, Tharrington, Smith & Hargrove, Raleigh, N. C., on brief), for appellant.

Anne Almy, U. S. Dept. of Justice, Washington, D. C. (Anthony C. Liotta, Acting Asst. Atty. Gen., Land and Natural Resources Div., Peter R. Steenland, Jr., Nancy S. Bryson, U. S. Dept. of Justice, Washington, D. C., on brief), for appellee.

Before BRYAN, Senior Circuit Judge, and ERVIN and CHAPMAN, Circuit Judges.

CHAPMAN, Circuit Judge:

Robert Earl Ward, Jr. appeals his conviction on eight counts of unlawful disposal of toxic substances [15 U.S.C. §§ 2614, 2605 and 40 C.F.R. § 761.01(b)] and aiding and

abetting the unlawful disposal of toxic substances [18 U.S.C. § 2]. Ward contends (1) that the evidence is insufficient to support a conviction, (2) that his federal prosecution is a violation of his right not to be placed in double jeopardy, because he had been tried and acquitted on state charges arising out of the alleged disposal, (3) that opinions of government experts were based on speculation and, therefore, inadmissible, and (4) that testimony from his state court trial from a witness now deceased was improperly excluded in the district court. We affirm.

Ward is chairman of the board of Ward Transformer Company. The company is in the business of purchasing, rebuilding and reselling used voltage transformers.[1] Many transformers contain oil laced with polychlorinated biphenyls (PCBs). The PCBs have a high ignition temperature or "flash point" which reduces the likelihood of fire in the event of transformer rupture. PCBs have been designated as toxic substances under the Toxic Substances Control Act (15 U.S.C. §§ 2601–2629) and accompanying regulations (40 C.F.R. part 761). Ward Transformer stored approximately 7500 gallons of PCB laced oil from used transformers at its plant near Raleigh, North Carolina.

As it became clear that disposal of PCB oil would be tightly regulated under the above mentioned act and regulations, Robert Burns, a long time friend of Ward, approached Ward to present him with a business proposition whereby Burns would become the "PCB king". From his studies, Burns concluded that the new regulations would prohibit further manufacture of PCB chemicals, but would permit continued use of existing PCB laced oil in electric transformers. Knowing also that transformer dealers would be eager to get rid of oil they had on hand, Burns felt he could acquire excess PCB oil from transformer dealers by charging a fee to remove it from their premises. He would store the oil then sell it back to dealers as they needed it for reconditioning used transformers. To implement this plan, Burns formed Transformer Sales Company, acquiring a storage facility in Youngsville, Pennsylvania.

Ward and Burns entered into an agreement whereby Burns would remove the 7500 gallons of oil from the Ward Transformer facility for a $1.70 per gallon removal fee. Burns was to be paid the full amount by check. He was to cash the checks and return seventy cents per gallon to Ward to retire an outstanding $50,000 debt.

Burns began to remove PCB oil from Ward Transformer's facility in 55 gallon drums and shipped them to Youngsville for storage. Two or three months into the operation, Burns realized that transportation and materials costs were making his venture unprofitable. He, therefore, devised a scheme, for which he sought Ward's approval, to dispose of the oil in remote areas by spraying it on the ground. Ward approved the plan and suggested at least one alternate dump site in South Carolina. Fort Bragg's impact range was decided on as the best spot for the dump. Burns outfitted a truck with a 750 gallon tank and a spray nozzle at the Ward Transformer plant. Ward's employees assisted in this project.

On June 24, 1978, Burns filled his tank truck with PCB oil at the Ward Transformer plant, drove to Fort Bragg, dumped the oil, and returned for another load which was also dumped at Fort Bragg. Two problems were encountered during this trip. First, the truck got stuck in the sandy area where the oil was dumped, and second, the sandy soil did not absorb the oil as well as Burns had anticipated. Burns recommended that the oil be sprayed along rural roadsides in North Carolina. Ward approved the plan.

To avoid detection, Burns improved the design of the tank truck. The old design with the 750 gallon tank, enclosed in a box

---

1. A transformer is a piece of equipment used in electrical power distribution to transform electrical energy from a higher voltage to a lower voltage or vice-versa depending upon the end use to which the power is to be applied.

with swinging doors, required someone to ride in the rear to open and close the doors. The new apparatus consisted of a pipe and nozzle directly behind the passenger door. When the dump site was reached the passenger would turn a valve directly behind his door and release the oil. Burns showed this new apparatus to Ward. All the work on the truck was done at Ward Transformer.

Burns' sons carried out the spraying operations in rural North Carolina. After loading the truck at Ward Transformer, the boys would pick out a stretch of rural road; the passenger would reach out and turn the valve releasing the contaminated oil; they would drive along at about 30 miles per hour dumping the oil in a four to six inch band along the roadside. On one occasion when the boys got stuck in the truck and had to call a wrecker, Burns reported to Ward that "nobody asked any questions."

Ward was advised on a daily basis of the progress of the unlawful disposal until August 4, 1978, when all the oil had been removed from Ward Transformer's plant.

The telltale strips of blackened grass along the rural North Carolina roadsides were quickly discovered by state and federal authorities. Shortly thereafter, Burns confessed to the unlawful dumping, at which time he stated that Ward had nothing to do with the scheme. When he learned that Ward was not participating in a plan to extricate the Burnses,[2] Burns repudiated his previous exculpatory statements and admitted that Ward had been intimately involved in the dumping scheme. Burns was the government's key witness on the issue of Ward's participation in the dumping scheme.

During the months immediately after discovery of the dump sites in North Carolina, authorities indicted Ward for malicious damage to real property under N.C.G.S. §§ 14–127, 14–3 and 14–5. Ward was acquitted by a state court jury.

*Sufficiency of Evidence*

■ The elements of the crime of causing the unlawful disposal of toxic substances under 15 U.S.C. §§ 2614, 2605 were correctly charged by the district court as (1) intentionally causing the disposal (2) of a PCB mixture containing 500 parts per million (ppm) or more PCBs (3) in a manner not authorized by 40 C.F.R. § 761.10. The court also instructed that under 18 U.S.C. § 2, whoever willfully aids, abets, counsels, commands, induces or procures the commission of the crime of unlawful disposal of toxic substances is punishable as a principal. Ward argues that the evidence at trial was insufficient in four particulars.

First, Ward asserts that there was no evidence that the oil was dumped at the places alleged in the indictment. This contention is without merit. The Burnses testified as to the various general areas where they dumped oil and the appearance of the spills as four to six inch strips of oil approximately two inches from the pavement along the rural roadsides. The strips of PCB oil mentioned in the indictment correspond to the general locations testified to by the Burnses. Moreover, their descriptions of the disposal sites matched exactly the characteristics of the sites covered by the indictment. This evidence is sufficient to support an inference that the oily strips covered by the indictment were those left by the Burnses.

■ Ward next asserts that there is no evidence that the oil was disposed of when the indictment alleges. It is well settled, however, that where an indictment alleges a crime occurred on or about a certain date, proof need only establish beyond a reasonable doubt that the crime occurred on a date reasonably near that alleged. *Bradford v. U. S.*, 413 F.2d 467 (5th Cir. 1969); *U. S. v. Brody*, 486 F.2d 291 (8th Cir. 1973). The district court so instructed.

The Burnses testified that they made disposal runs throughout the week prior to the first date alleged in the indictment as well as during the period of July 28, 1978

2. Robert Burns and his two sons were implicated in the investigations.

through August 2, 1978 which was alleged. We find this testimony sufficient to support the jury's finding that the unlawful dumpings occurred on a date reasonably near that alleged in the indictment.

Third, Ward contends that the evidence presented at trial is insufficient to support an inference that he caused the disposal of the PCB oil or that he aided and abetted in the unlawful disposal. He argues instead that there is only evidence of his knowledge of a general plan and his failure to take steps to stop it. We find, however, that there is a sufficient basis in the record from which the jury might properly infer that Ward was an active participant in the disposal scheme.

Most damaging to Ward is the testimony of Robert Burns[3] that for every change in plan he sought and obtained approval from Ward, and that Ward himself suggested at least one alternate dump site. Other evidence from which the jury might conclude that Ward participated in the plan is the fact that outfitting and refinement of the disposal vehicles took place on the Ward Transformer premises with the aid of Ward employees.

Finally, Ward argues that there was insufficient evidence that the oil sprayed contained more than 500 ppm PCBs. The chemical analysis done by government experts indicated levels of PCBs in the soil samples taken from 2,200 ppm to 14,800 ppm. Ward argues that these tests only show what levels of PCBs were in the soil,

not the level of PCBs in the mixture poured onto the soil. Expert testimony,[4] as well as common sense, indicates that soil would dilute concentrations of PCBs poured onto it. This fact, coupled with the extremely high concentrations found in the soil, is sufficient to support the jury's finding that the oil disposed of contained at least 500 ppm PCBs.

## Double Jeopardy

Ward argues that this federal prosecution is a violation of his rights under the Fifth Amendment not to be placed in double jeopardy. Ward was tried and acquitted of state charges of malicious damage to real property under N.C.G.S. §§ 14–127, 14–3 and 14–5.

The state charges require a showing of malice and damage to real property; the federal charges do not. The federal charges require proof of disposal in a manner not approved by 40 C.F.R. § 761.01(b); the state charges do not. The elements of the state and federal offenses here involved are, therefore, sufficiently different to avoid the proscription of the Double Jeopardy Clause. *Blockburger v. U. S.*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), *Iannelli v. U. S.*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975).

AFFIRMED.

---

**3.** Ward argues that evidence of Burns' credibility was improperly excluded. Testimony of a witness in an earlier state court trial arising out of the same facts as the present case was offered as evidence that Burns had stated he was solely responsible for the dumpings. The witness died prior to the federal prosecution. The trial court concluded that the evidence merely tended to show that Burns had stated he signed a statement exculpatory of Ward. Because this evidence was already in the record and the government would have no opportunity to cross-examine the witness, the district court properly excluded the testimony as cumulative.

**4.** Ward argues that the opinions of the government experts on whether the oil (rather than the soil) contained 500 ppm PCBs are based on

speculation and, therefore, entitled to no weight, since only soil was tested for PCB content. The conclusion reached by the experts that the oil contained the requisite amounts of PCBs was based on the extremely high levels found in the soil and their expert opinions that soil would dilute rather than increase those levels.

Ward's contention that the tests are entitled to no weight because no tests were conducted that indicated the amounts of PCBs in the soil prior to the dumpings is without merit. Though experts did testify that PCBs have become so pervasive that they have even been found in mother's milk, they also testified that trace levels normally encountered in the environment are substantially less than levels found in the soil samples.