UNITED STATES

v.

Joseph L. JILES II, 151 58 2312, Private First Class (E–2), U.S. Marine Corps.

NMCM 98 00492.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 17 July 1997.

Decided 31 Aug. 1999.

LT John D. Holden, JAGC, USNR, Appellate Defense Counsel.

LT James E. Grimes, JAGC, USNR, Appellate Government Counsel.

Before DeCICCO, Chief Judge, TROIDL, Senior Judge, and ANDERSON, Appellate Military Judge.

TROIDL, Senior Judge:

A general court-martial with officer and enlisted members convicted the appellant, contrary to his pleas, of conspiring with Private (Pvt) Escobar to distribute marijuana, in violation of Article 81, Uniform Code of Military Justice, 10 U.S.C. § 981 (1994).[1] The adjudged sentence includes a dishonorable discharge, 12 months confinement, reduction to pay grade E–1, and forfeiture of $1010.10 pay per month for 12 months. The convening authority approved the discharge, confinement and reduction as adjudged and rounded down the forfeiture of pay to the nearest whole dollar.

We have carefully reviewed the record of trial, the appellant's six assignments of error, and the Government's response. Except as noted below, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ.

### Legal Sufficiency—No Meeting of the Minds

The appellant contends that the evidence was not legally sufficient to sustain his conviction because he was alleged to have conspired with a Government agent and thus there was no meeting of the minds as required in the "bilateral theory" of conspiracy. The Government urges that we apply a "unilateral theory" of conspiracy, whereby the offense of conspiracy is committed when an individual enters into an agreement to commit an offense with another, even if that other person does not share the individual's criminal intent. The Government acknowledges that the Court of Appeals for the Armed Forces has not adopted this theory.

■ The test for legal sufficiency requires this court to review the evidence in the light most favorable to the Government. In doing so, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the evidence is legally sufficient. *Jackson* v. *Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987).

Prior to 1983, it was "well settled that there can be no conspiracy when a supposed participant merely feigns acquiescence with another's criminal proposal in order to secure his detection and apprehension by proper authorities." *United States v. LaBossiere*, 13 U.S.C.M.A. 337, 340, 32 C.M.R. 337, 340 (1962) (citations omitted). Following our superior Court's decision in *United States v. Garcia*, 16 M.J. 52 (C.M.A.1983), in which the "rule of consistency"[2] was abandoned, the Army Court of Military Review decided *United States v. Tuck*, 28 M.J. 520 (A.C.M.R. 1989), and held that *Garcia* had actually rejected the "bilateral theory" of conspiracy and embraced the "unilateral theory" in military practice. In the lead opinion in *United States v. Anzalone*, 43 M.J. 322, 325 (1995), Judge Crawford reflected a similar reading of *Garcia* when she wrote that "[i]n *Garcia* we adopted the American Law Institute's Model Penal Code 'Unilateral Approach' to conspiracy." However Judge Gierke, in a concurring opinion joined by Judge Cox, and Judge Wiss, in a separate concurring opinion, flatly rejected the view that after *Garcia* no meeting of the minds is necessary in order for there to be a conspiracy. *Anzalone*, 43 M.J. at 326, 328. Then–Chief Judge Sullivan, in yet another separate concurring opin-

---

1. The members acquitted the appellant of another specification of conspiring to distribute marijuana and two specifications of distributing marijuana in violation of Articles 81 and 112a, UCMJ, respectively.

2. Under this rule "the acquittal of one of two conspirators requires the acquittal of the other."

*United States v. Nathan*, 12 C.M.A. 398, 30 C.M.R. 398, 1961 WL 4460 (1961). Appellate reversal was required if the appellant's only other conspirator was acquitted of the conspiracy charge. *United States v. Fisher*, 16 C.M.A. 78, 36 C.M.R. 234, 1966 WL 4450 (1966).

ion, simply wrote that the precedential force of *LaBossiere* was severely undermined by *Garcia.* *Id.* at 326.

■ Against this backdrop, the Army Court of Criminal Appeals recently overruled its decision in *Tuck* to the extent that *"Tuck* interpreted *Garcia* to eliminate the requirement that an accused must conspire with a bona fide co-conspirator" to be guilty of conspiracy. *United States v. Valigura,* 50 M.J. 844 (Army Ct.Crim.App.1999). Our sister court went on to hold that "[u]ntil Congress amends the statute or our superior court interprets it otherwise, we find that the military law of conspiracy requires an actual agreement to commit an offense under the Code between an accused and another person. There is neither a true agreement nor a meeting of the minds when an individual 'conspires' to violate the law solely with a government pretender." *Valigura,* 50 M.J. at 848. We concur with our sister court's holding, adopt it as our own, and conclude that the evidence in this case was legally insufficient to find that the appellant entered into an agreement with another to commit an offense and thereby engaged in a conspiracy. He may, however, be guilty of the lesser included offense of attempted conspiracy if the evidence is factually sufficient. MANUAL FOR COURTS-MARTIAL, UNITED STATES, Part IV, ¶ 5d (1998 ed.); *see also United States v. Riddle,* 44 M.J. 282, 285 (1996).

### Factual Sufficiency

The appellant also asserts that the evidence was factually insufficient to support his conviction of conspiracy. Based upon our earlier findings, we have reviewed the record to determine whether the evidence was legally sufficient to support a finding of guilty of the lesser included offense of attempted conspiracy in violation of Article 80, UCMJ.

■ The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, this court is convinced of the accused's guilt beyond a reasonable doubt. *United States v. Turner,* 25 M.J. 324, 325 (C.M.A.1987). In resolving the question of factual sufficiency, we have carefully reviewed the record of trial, the briefs of counsel, and have given no deference to the factual determinations made at the trial level. Based on that review, we are convinced beyond a reasonable doubt of the appellant's guilt of an attempted conspiracy with Pvt Escobar.

■ The Government's evidence against the appellant consisted of the testimony of Pvt Escobar and Naval Criminal Investigative Service (NCIS) Special Agent (SA) Pipenhagen, and a tape recording of a telephone conversation between Pvt Escobar and the appellant made by NCIS. The evidence established that in October 1996, Pvt Escobar was questioned as a possible witness to an assault committed off base. Record at 74. During the course of his questioning, Pvt Escobar was asked whether he would be interested in working with NCIS as a cooperating witness (CW). Record at 74, 131, 145. After considering the proposal and discussing the matter with his mother, an attorney, Pvt Escobar accepted the offer to become a CW. He accepted the offer both because he saw it as a way to further his ambition of pursuing a law enforcement job after separating from the Marine Corps and at because he was facing nonjudicial punishment at his command for some minor disciplinary infractions. Record at 74, 91, 108–111, 115, 132.

As a CW, Pvt Escobar worked with SA Pipenhagen and was asked to attempt to purchase illegal drugs from Private First Class (PFC) Shabazz and others to whom it was believed he was parceling out drugs. Record at 76, 102, 133. Pvt Escobar was initially given $40 to make a drug purchase and $30 for expenses related to his activities. Record at 76, 102, 103, 133, 150. After gaining confidence that Pvt Escobar could purchase illegal drugs, SA Pipenhagen decided to attempt to set up a controlled buy.[3] Record at 139, 140. SA Pipenhagen had Pvt Escobar call the appellant at his work place and arrange a meeting at Corporal [Cpl]

---

3. SA Pipenhagen explained that a controlled buy occurs when the cooperating witness is searched before the buy, the buy location is staked out, and the witness is searched after the buy. Record at 132.

Jones' barracks room. Record at 85, 86, 92. SA Pipenhagen then gave Pvt Escobar $60 for the purchase of a single bag of marijuana. Record at 107, 139. Prior to leaving for Cpl Jones' room, Pvt Escobar was searched and briefed on what was expected of him. Record at 86, 91, 139–40. Due to the difficulty NCIS would have following Pvt Escobar and the appellant if they left the base to obtain the drugs, Pvt Escobar was told that he was not to go anywhere with the appellant in order to obtain the marijuana. Record at 89, 140. Pvt Escobar was then dropped off some distance from Cpl Jones' barracks and was followed by NCIS agents as he made his way to Cpl Jones' room. Record at 86, 87, 107, 140. No NCIS agent followed Pvt Escobar into Cpl Jones' room, but one agent waited in the passageway outside the room. Record at 87, 107, 108, 148. While Pvt Escobar was in Cpl Jones' room, NCIS agents kept the barracks under surveillance. Record at 140–41.

Pvt Escobar played video games in Cpl Jones' room for some period of time before the appellant arrived. Record at 87, 88. While waiting for the appellant to arrive, Pvt Escobar left the room at least once and called an NCIS agent to explain that the appellant had not yet arrived. Record at 141, 148. After some initial small talk when the appellant arrived, Pvt Escobar stated that he needed to buy marijuana for a friend. Record at 88, 89. When the appellant asked Pvt Escobar to accompany him "down south," Pvt Escobar declined, stating he was in a "Liberty Risk" status and could not leave the base. Record at 88, 89. Pvt Escobar ultimately gave the appellant the $60 provided to him by NCIS, and the appellant agreed that he would get back to Pvt Escobar the next day. Record at 89, 90, 129. After some additional small-talk, Pvt Escobar left the room and was followed by the NCIS agent in the passageway to a pre-arranged location. Pvt Escobar was then taken to an NCIS office where he was searched and debriefed per standard operating procedures. Record at 90, 91, 107, 108, 141.

When Pvt Escobar did not hear back from the appellant, SA Pipenhagen had Pvt Escobar telephone the appellant at work on 5 November 1997 to discuss the marijuana for which Pvt Escobar had previously given the appellant $60. Record at 92–97, 142. This telephone call was taped. Record at 94, 142; Prosecution Exhibit 1. The overall tone of the conversation was very friendly, as indicated by the appellant's calling Pvt Escobar a derogatory term with no apparent malicious intent and no offense taken. Prosecution Exhibit 1. Pvt Escobar then asked the appellant if he had spoken to PFC Shabazz about "that weed," meaning marijuana. Record at 98, 99; Prosecution Exhibit 1. The appellant responded by saying that he had not seen PFC Shabazz since they had been together at a particular club. Prosecution Exhibit 1. Pvt Escobar then expressed concern, stating that he was going to need "that" (the weed), and indicated that everyone was mad at him, and was about to say what "they," the people for whom he was buying the marijuana, were saying. Record at 99; Prosecution Exhibit 1. Before Pvt Escobar could complete his thought, however, the appellant completed it for him with the words "saying you was bullshitting?" Prosecution Exhibit 1. Pvt Escobar agreed with this assessment and started to explain that it was causing him to look bad, at which point the appellant indicated his understanding of the problem by uttering a series of "yeahs." Prosecution Exhibit 1. The appellant then suggested that Pvt Escobar could directly contact PFC Shabazz more quickly and confirmed that Pvt Escobar had PFC Shabazz's cellular telephone number. Record at 99; Prosecution Exhibit 1. Their conversation then wandered to a discussion of an upcoming military ball, and Pvt Escobar then determined that the appellant would be going to Cpl Jones' room after securing from work. Prosecution Exhibit 1. They concluded their conversation with Pvt Escobar saying, "and if, you know, you have anything, just," at which point the appellant said, "yeah, all right." Prosecution Exhibit 1. Approximately two weeks later, PFC Shabazz supplied Pvt Escobar with marijuana, in exchange for the $60 Pvt Escobar had given to

the appellant.[4] Record at 100, 142, 154. This delivery was done under controlled circumstances. Record at 154. Pvt Escobar was searched before the delivery, was wearing a "wire," and was watched by NCIS agents walking into and out of PFC Shabazz's house. Record at 154. Pvt Escobar turned over a quantity of marijuana to SA Pipenhagen after leaving PFC Shabazz's house. Record at 154.

In November 1996, PFC Shabazz discovered that Pvt Escobar was working with NCIS as a CW, and Pvt Escobar was removed from the area. Record at 120, 121, 157. In January 1997, Pvt Escobar committed sodomy and indecent acts with a 14–year–old girl. Record at 72, 73, 101. When questioned about these offenses, he falsely swore that she had told him that she was 18 years-old. Record at 73. Facing the possibility of life imprisonment if convicted, Pvt Escobar negotiated a pretrial agreement in which the convening authority agreed to suspend all confinement in excess of nine months. Record at 100, 112. Part of the consideration for the agreement was that Pvt Escobar agreed to cooperate in the prosecution of the appellant. Record at 101, 112. In May 1997, Pvt Escobar was sentenced to 21 months confinement for the sodomy and indecent acts with a minor and making the false official statement. Record at 107, 112, 115. In July 1997, while still confined as a result of his own court-martial, Pvt Escobar testified against the appellant. Record at 72, 112, 113. At that trial, the defense elicited all of the above information and introduced opinion and reputation evidence that indicated Pvt Escobar was not renowned for his truthfulness. Record at 209–212; Appellate Exhibit XVII.

From our careful review of the record, it is clear that Pvt Escobar was not a model CW or witness, and it is no wonder that the members found the appellant not guilty of all of the charged offenses for which the only evidence offered by the Government was Pvt Escobar's uncorroborated testimony. As for the single offense currently under review, we find that his testimony, in combination with the testimony of SA Pipenhagen, and, most importantly, the taped conversation between Pvt Escobar and the appellant, is factually sufficient and convinces us of the appellant's guilt of the offense of attempted conspiracy beyond a reasonable doubt. The assignment of error is without merit.

## Legal Sufficiency—Co–Conspirator's Testimony

Citing *United States v. Lee*, 6 M.J. 96 (C.M.A.1978), the appellant argues that the evidence is legally insufficient to sustain his conviction because an individual cannot be convicted solely on the uncorroborated testimony of an accomplice which is self-contradictory, uncertain, improbable, or implausible. Appellant's Brief of 2 Mar 1999 at 9. Without deciding whether or not the appellant is correct in his contention as to the law[5] and after considering the testimony of Pvt Escobar with respect to the attempted conspiracy offense with great caution, we find that it was not self-contradictory, uncertain, improbable, or implausible, and also find that there was adequate independent corroboration of Pvt Escobar's testimony. We are convinced that the evidence is both legally and factually sufficient to sustain his conviction of attempted conspiracy beyond a reasonable doubt.

## Wharton's Rule

■ The appellant next asserts that the military judge erred when he denied his motion to dismiss the conspiracy offense "for violating Wharton's Rule, which holds that

4. The appellant was not charged with this distribution of marijuana.

5. Paragraph 74a(2) of the MANUAL FOR COURTS-MARTIAL, UNITED STATES (1969 ed.), upon which the *Lee* decision was based, was omitted from the 1984 and subsequent revisions of that Manual. *See United States v. Westmoreland*, 31 M.J. 160, 167 (C.M.A.1990)(noting without deciding the effect of the omission of the earlier express requirement for corroboration of accomplice testimony). In its stead is the following language, which appears in a discussion section of the current Manual, "findings of guilty may not be based solely on the testimony of a witness other than the accused which is self-contradictory, unless the contradiction is adequately explained by the witness. Even if apparently credible and corroborated, the testimony of an accomplice should be considered with great caution." RULE FOR COURTS-MARTIAL 918(c), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.), Discussion.

there can be no conspiracy where the agreement exists only between persons necessary to commit such an offense." [6] Appellant's Brief of 2 Mar 1999 at 27. We disagree.

In *Iannelli v. United States*, 420 U.S. 770, 782–84, 785–86, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975), the Supreme Court explained Wharton's rule as follows:

This Court's prior decisions indicate that the broadly formulated Wharton's Rule does not rest on principles of double jeopardy, *see Pereira v. United States*, 347 U.S. 1, 11, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *Pinkerton [v. United States]*, [328 U.S. 640], at 643–644[, 66 S.Ct. 1180] [1946]. Instead, it has current vitality only as a judicial presumption, to be applied in the absence of legislative intent to the contrary. The classic Wharton's Rule offenses—adultery, incest, bigamy, dueling—are crimes that are characterized by the general congruence of the agreement and the completed substantive offense. The parties to the agreement are the only persons who participate in commission of the substantive offense, and the immediate consequences of the crime rest on the parties themselves rather than on society at large. See *United States v. Bobo*, 477 F.2d, at 987. Finally, the agreement that attends the substantive offense does not appear likely to pose the distinct kinds of threats to society that the law of conspiracy seeks to avert. It cannot, for example, readily be assumed that an agreement to commit an offense of this nature will produce agreements to engage in a more general pattern of criminal conduct. *Cf. Callanan v. United States*, 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961); *United States v. Rabinowich*, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211 (1915)....

Wharton's Rule applies only to offenses that require concerted criminal activity, a plurality of criminal agents. In such cases, a closer relationship exists between the conspiracy and the substantive offense because both require collective criminal activity. The substantive offense therefore presents some of the same threats that the law of conspiracy normally is thought to guard against, and it cannot automatically be assumed that the Legislature intended the conspiracy and the substantive offense to remain as discrete crimes upon consummation of the latter. Thus, absent legislative intent to the contrary, the Rule supports a presumption that the two merge when the substantive offense is proved. [Footnotes omitted.]

Based upon our review of this case, we find that the military judge correctly ruled that Wharton's Rule did not require dismissal of the conspiracy offense. The appellant was not charged with the drug distribution that was the object of the conspiracy; there is no requirement under Article 112a, UCMJ, that a person to whom a drug is unlawfully distributed be criminally culpable of any offense, let alone have the same criminal intent as the transferor; and, although PFC Shabazz was not listed as a co-conspirator, it was clearly understood that the appellant would obtain the marijuana from PFC Shabazz, and he ultimately did complete the substantive offense by personally providing Pvt Escobar with the marijuana for which Pvt Escobar had previously paid the appellant. Accordingly, we find no "congruence of the agreement and the completed substantive offense," no requirement for "concerted criminal activity" in order to complete the substantive offense, and no basis for concluding that the charged conspiracy and uncharged distribution merged at trial. As a result, the substantive offense did *not* present "some of the same threats that the law of conspiracy normally is thought to guard against," and it *can* automatically be assumed that the Legislature intended the conspiracy and the substantive offense to remain as discreet crimes even upon consummation of the latter. Additionally, the parties to the agreement were *not* "the only persons who participate[d] in commission of the substantive offense" and the immediate consequences of drug distribution do not rest on the parties themselves but rather on society at large. The assignment of error is without merit.

---

**6.** Wharton's Rule is reflected in MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), Part IV, ¶ 5c(3). *See* Analysis of Punitive Articles, Appendix 23, p. A23–2, MCM.

## Post–Trial Motion

■ On 17 July 1997, after the members announced the appellant's sentence and the military judge reviewed with the appellant his appellate rights statement, the military judge adjourned the court-martial. RULE FOR COURTS-MARTIAL 1011, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.). Thereafter, on a date uncertain, the appellant filed a motion for appropriate relief in which he requested a post-trial Article 39(a), UCMJ, session "to inquire into the misconduct, perjury, of the primary government witness in this case, Private (Pvt) Escobar." Appellate Exhibit XLI at 1. Additionally, the appellant requested that the military judge declare a mistrial pursuant to R.C.M. 915 or, in the alternative, "allow the defense to reopen it's (sic) case and present this new evidence to the members." Appellate Exhibit XLI at 4. The Government filed a response to this motion on 3 October 1997. Appellate Exhibit XLII. The military judge granted the motion for a post-trial Article 39(a), UCMJ, session pursuant to R.C.M. 1102, and that session was held on 6 October 1997. Record at 295. At this session, the appellant's defense counsel requested that the "military judge grant a mistrial, or in the alternative, a new trial." Record at 298.

In support of his motion, the appellant and two other Marines assigned to the brig at the same time as the appellant and Pvt Escobar testified that Pvt Escobar had recanted his testimony against the appellant. The appellant also introduced two letters written by Pvt Escobar and an audio-tape of a telephone conversation between Pvt Escobar and the appellant's mother, all of which came into existence after the appellant's trial had adjourned. All of the defense evidence cast doubt as to Pvt Escobar's credibility and the truthfulness of his testimony given during the appellant's trial. Pvt Escobar testified for the Government, explaining that his testimony at the appellant's trial was truthful. He indicated that his post-trial conversations and letters were accurate in so far as they indicated that the appellant was innocent of drug distribution, and to the extent they indicated that the appellant was innocent of any crime, he was merely attempting to en-sure he did not have any trouble during his last few weeks in the brig, given that he was confined in the same brig as the appellant, Pvt Shabazz, and one other confinee against whom Pvt Escobar had testified.

Following the presentation of evidence, the appellant's counsel argued that an entirely new trial was warranted and that simply reopening the case and presenting the new evidence to the original members was an inadequate remedy. Record at 407, 408, 411. The military judge denied the motion for a mistrial, finding that the evidence did not cast doubt upon the fairness of the proceedings. R.C.M. 915; Record at 427; Appellate Exhibit XLIII at 5. The appellant does not take issue with this ruling in his appeal. Appellant's Brief of 2 Mar 1999 at 25.

The military judge also denied the motion to reopen. Record at 427; Appellate Exhibit XLIII at 5. Citing *United States v. Fisiorek*, 43 M.J. 244 (1995), the appellant asserts that the military judge abused his discretion when he refused to allow the appellant to reopen his case. In their brief, the Government views the motion at trial to have been for a new trial based upon newly discovered evidence in accordance with R.C.M. 1210(f)(2). The Government agrees that the standard of review in this case is abuse of discretion. Government Brief of 28 Apr 1999 at 15. An abuse of discretion occurs where "the military judge's findings of fact are clearly erroneous or his decision is influenced by an erroneous view of the law." *United States v. Kelley*, 45 M.J. 275, 280 (1996).

Before ruling on the appellant's motion, the military judge made detailed findings of fact. Appellate Exhibit XLIII. Since we find that these findings are supported by the evidence of record and are not clearly erroneous, we adopt those findings as our own. We will conduct a *de novo* review of the military judge's conclusions of law.

Our superior court has "interpreted Article 39(a) of the Uniform Code of Military Justice to authorize the military judge to take such action after trial and before authenticating the record as may be required in the interest of justice." *United States v. Scaff*, 29 M.J. 60, 65 (C.M.A.1989) (citations omitted). That court went on to state that "we still are

persuaded that Article 39(a) of the Code empowers the military judge to convene a post-trial session to consider newly discovered evidence and to take whatever remedial action is appropriate." *Scaff,* 29 M.J. at 66.

Based upon *Fisiorek,* the appellant argues that one possible remedial action was to reopen the trial, present the new evidence to the members, and have them reopen their deliberations on findings. The circumstances in this case do not mirror those in *Fisiorek,* where the newly discovered evidence was discovered and presented to the military judge after findings but before sentencing and adjournment. Hence, the reasons cited by the court for having a lesser standard for reopening a case than is applied to a request for a new trial are not present here. Nonetheless, we apply the guidance provided in that case to these facts since our superior court "declined the opportunity ... to fashion a particular rule to guide military judges in exercising discretion on whether to permit a party to reopen his or her case." *Fisiorek,* 43 M.J. at 247, 248. That guidance includes the following factors:

> Suffice it to say, normal rules of relevance, cumulativeness, adequacy of substitutes in the record, completeness of the record, the interests of justice, the elimination of post-trial attacks on the verdict, as well as mitigation of ineffective-assistance-of-counsel claims are all considerations. But the primary consideration should be whether discovery of the new evidence is bona fide and whether the new evidence, if true, casts a substantial doubt upon the accuracy of the proceedings; that is, a rule which is not only fair to the defendant, but fair to the prosecution as well.

*Id.* at 248.

Applying this guidance to the evidence presented by the appellant, the military judge concluded that the appellant had "failed to establish that the new evidence—even if interpreted as discussed and even if believed—raises a substantial doubt as to the accuracy of the trial." Appellate Exhibit XLIII at 5. We agree with the military judge's conclusion and find that the new evidence would have done nothing more than impugn the credibility of a witness who the members, as demonstrated by their findings in this case, had already found unbelievable, except when his testimony was made credible by the partial corroboration of an NCIS agent and the clear understanding between the appellant and Pvt Escobar reflected in their taped conversation of 5 November 1996. The new evidence did nothing to diminish the credibility or importance of the agent's testimony or the appellant's own words on the audio-tape. Hence, we find no substantial doubt as to the accuracy of the proceedings and no abuse of discretion by the military judge in denying the motion to reopen.

■ Another possible remedial action available to the military judge was to grant the appellant a new trial, applying the standards set out in R.C.M. 1210(f)(2). *Scaff,* 29 M.J. at 66. Those standards are as follows:

> (2) Newly discovered evidence. A new trial shall not be granted on the grounds of newly discovered evidence unless the petition shows that:
>
> > (A) The evidence was discovered after the trial;
> >
> > (B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and
> >
> > (C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

R.C.M. 1210(f)(2).

Although the appellant has met the first two parts of this test, for the reasons cited above, he has not shown that the newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused. To the extent that the military judge's ruling may be seen as a denial of a petition for a new trial, we hold that the military judge did not abuse his discretion in denying that petition.

### Findings

Accordingly, we affirm only the finding of guilty of the lesser included offense of at-

tempted conspiracy. Specifically, we find that the appellant did, on or about 29 October 1996, at Camp Hansen, Okinawa, Japan, attempt to conspire with Private First Class Andy Luis Escobar, U.S. Marine Corps, to commit an offense under the UCMJ, to wit: wrongful distribution of some amount of marijuana to Private First Class Escobar, and in order to effect the object of the conspiracy the said Private First Class Jiles did receive $60 U.S. currency from Private First Class Escobar, did tell Private First Class Escobar that he could pick up the marijuana the next day, and did tell Private First Class Escobar to call him the next day, in violation of Article 80, UCMJ.

### Sentence

■ When this court finds a prejudicial error at trial, it "must assure not only that it deems the sentence to be appropriate to the affirmed findings of guilty but also that the sentence is no greater than that which would have been imposed at trial if the prejudicial error had not been committed." *United States v. Cook*, 48 M.J. 434, 438 (1998)(citing *United States v. Suzuki*, 20 M.J. 248, 249 (C.M.A.1985)).

■ If we were to conclude that we could not reliably determine what sentence would have been imposed at the trial level if the error had not occurred, a rehearing on sentence would be in order. *Cook*, 48 M.J. at 438 (citing *United States v. Sales*, 22 M.J. 305, 307 (C.M.A.1986)). However, on those occasions where we are convinced that the appellant's sentence would have been at least of a certain magnitude, even if no error had occurred at trial, the court may remedy the error by reassessing the sentence itself or by deciding that the error was not prejudicial. *Cook*, 48 M.J. at 438; *see* Art. 59(a), UCMJ. Given that the error reflects only a legal distinction based upon the status of the appellant's co-conspirator, a status that was well-known to the members, and did not in any way alter what the appellant did or the maximum punishment that could have been imposed for his misconduct,[7] we find that the original sentence was not affected by the

military judge's error at trial. Since the error was not prejudicial as to the appellant's sentence, he is not entitled to any sentencing relief as a result of that error.

Finally, we consider the appellant's assertion that his sentence is inappropriately severe. Although we are confident that the members and the convening authority below acted appropriately, and although we do not enter the realm of clemency which is reserved to the convening authority, we are compelled to act when we find a sentence inappropriately severe, since we can approve only those findings and sentence which *should be approved.* Art. 66(c), UCMJ; *United States v. Healy*, 26 M.J. 394, 395–96 (C.M.A.1988); R.C.M. 1107(b). *See generally United States v. Spurlin*, 33 M.J. 443, 444 (C.M.A.1991). After careful consideration, we affirm only so much of the sentence as provides for a bad-conduct discharge, confinement for 12 months, forfeiture of $1,010 pay per month for 12 months, and reduction to pay grade E–1.

Chief Judge DeCICCO and Judge ANDERSON concur.

---

7. The maximum authorized punishment was a dishonorable discharge, 15 years confinement, total forfeitures, and reduction to E–1.