IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 7, 2004 Session

## STATE OF TENNESSEE v. MICHAEL WARD, II

**Direct Appeal from the Criminal Court for Coffee County**
**Nos. 30, 857     L. Craig Johnson, Judge**

---

**No. M2003-00734-CCA-R3-CD - Filed June 22, 2004**

---

The Defendant, Michael Ward, II, was convicted by a jury of attempted second degree murder, aggravated spousal rape, especially aggravated kidnapping, aggravated robbery, and aggravated burglary. In this direct appeal, the Defendant raises five issues: (1) whether the evidence is sufficient to sustain his five convictions; (2) whether double jeopardy bars multiple convictions that all require proof of the element of serious bodily injury; (3) whether the trial court erred by admitting evidence of the Defendant's prior bad acts; (4) whether the Defendant was prejudiced by the State's failure to provide him with discovery items; and (5) whether the Defendant is entitled to a new trial based on the cumulative effect of the alleged trial errors. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Anthony Avery, Knoxville, Tennessee, for the appellant, Michael Ward, II.

Paul G. Summers, Attorney General and Reporter; Elizabeth Marney, Assistant Attorney General; C. Michael Layne, District Attorney General; and Jason Ponder, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The victim, Michelle Ward, was married to the Defendant on November 9, 1997. They separated in August of 2000. The Defendant moved out, leaving Ms. Ward to care for her three children and the Defendant's son. In October of 2000, Ms. Ward obtained an order of protection against the Defendant which prohibited direct communication between them and which also denied the Defendant access to Ms. Ward's residence. Ms. Ward moved to a new residence in November of 2000. Ms. Ward testified that the Defendant violated the order of protection numerous times by calling her, spying on her, following her, and threatening her. He told her that he wanted to get back

together with her and that he was addressing his problems with medication and therapy. On one occasion, while Ms. Ward was returning home from shopping, she noticed someone in the back of her van. When she got home, she and her sister, Ashley Cupp, opened the back of the van and found the Defendant. He got out of the van and walked away from them. He later returned to their home yelling profanities and demanding that Ms. Ward give him his son, which she ultimately did. Approximately thirty minutes later, the Defendant returned and apologized, saying "he just wanted [Ms. Ward] back in his life, and he was going to do whatever it took."

On the night before the attack that is the subject of this appeal, the Defendant sent Ms. Ward several electronic pages using a numeric code that they devised while they were married. According to Ms. Ward, the pages read, "'Till death do us part" and "Death by rape." Ms. Ward did not take the pages seriously because she was accustomed to his threats.

On the next day, November 20, 2000, the Defendant called Ms. Ward at her office in the early afternoon. He apologized for the pages and said that he had a chemical imbalance. He assured her that he was in therapy and he would work his problems out so that he could be good to her and the children. A few minutes after 10:00 that evening, Ms. Ward made a trip to her old residence to do laundry and make telephone calls because her washing machine and phone were still located there. As she was about to leave through the front door, someone forced the door closed. She felt an arm go around her neck and force her into "a headlock position." Then she felt several blows to the left side of her head. She yelled for the Defendant to stop, but he did not. She urinated and collapsed to her knees. The Defendant forced Ms. Ward onto her back and planted his knees on her chest while he continued hitting her in the head with his fists. The victim testified that "he looked right at me in my eyes, and then he started to choke me." The victim kept saying their daughter's name, hoping to "snap [the Defendant] out of it." Eventually the victim lost consciousness.

When she regained consciousness, she was still on the floor, but the Defendant had removed her pants and was "pulling [her] up onto [her] knees." As he did so, he told her to not make a sound, and he hit her a few more times in the head. The Defendant then anally penetrated the victim with his penis for thirty seconds or a minute. The Defendant then rolled her onto her back and climbed on top of her. Ms. Ward kicked him, but that "just made him madder." In her words, "He told me he was going to kill me, and he put his arms and his hands around my neck, and that time, I wanted him to just finish it, just go, but I just went unconscious. I didn't die."

When Ms. Ward regained consciousness the second time, she was naked on the floor in her van. She heard the Defendant say that he had a place picked out where he was going to dump her body, and he would get away with it. The victim looked out the window and saw a sign for Sewanee; therefore she knew that she was near Monteagle. She found her clothes on the floor of her van, but they were wet with urine. She testified that the Defendant said he could not believe that she was alive. He also said "he thought for sure he had [her] that time." Ms. Ward testified that the Defendant had a metal pipe with him that was "about two feet long" and "heavy." The Defendant threatened to hit her with it. For about an hour Ms. Ward stayed down, and the Defendant talked about where he was going to bury her. Eventually the victim began begging the Defendant to let her

sit up front with him so they could work things out. She kissed and held his hand, and he let her sit in the front seat. Ms. Ward explained to him that she needed to get home so her daughter would not be worried. The Defendant apologized and said that, if he took her home, she would have to wait until after 6:00 a.m. to call the police so he would have time to kill himself. Ms. Ward promised to abide by his wishes, and he eventually let her go at an automobile body shop. He gave her his "84 Lumber" cap, his watch, his necklace, and his wedding ring to give to his children "to remember him by."

After the Defendant got out, Ms. Ward immediately left in her van. She got lost, but she eventually got home between 3:00 and 3:30 in the morning. Shortly after she got home, the Defendant returned in his truck. He stopped in front of her house, honked his horn, and placed an object in her mailbox, which turned out to be a cassette tape of his "last will and testament" and a statement to the victim and their children.

Eventually the police came, and Ms. Ward was taken to the emergency room, where she stayed for approximately three hours. Meanwhile, the Defendant called the victim's former residence and left a message on her answering machine. In the message, he apologized and asked her to page him on the pager he took from her. In addition to the pager, she determined that the Defendant had taken eighty dollars from her. Acting on the advice of police officers, the victim contacted the Defendant and arranged a meeting, and the police apprehended him.

Ms. Ward testified that, after the attack, her "whole body hurt." Her head hurt and was swollen, so doctors performed a CAT scan. She was unable to take a shower for days because of the pain. When she finally did, her mother had to help her. She was unable to wash or brush her hair because her head was so sore, and she had trouble urinating. Her doctor prescribed Zoloft for anxiety and depression, which were associated with post-traumatic stress syndrome that occurred months after the attack. She was prescribed Remeron for nightmares. She had to take Xanax for her anxiety. In her words,

> I wouldn't leave my house, and I wouldn't get in my car. I was afraid he was in my car. I called the police department on a daily basis to see if he was still in jail because I thought he would escape, so they kept changing the Zoloft to Paxil to Prozac. Nothing was working.

Dr. Christopher Smith was working in the emergency room at Manchester Medical Center on November 21, 2000, and he treated the victim. He explained that Ms. Ward had "multiple trauma to her face and to her extremities and a lot of bruising." She had low blood pressure, slow, deliberate speech, and diminished memory, which are all signs of shock. She was depressed and anxious. There were "microhemorrhages behind [her] eyes that showed trauma to the head." These microhemorrhages are also consistent with having been choked. The doctor noted much swelling and bruising about Ms. Ward's face, and her neck muscles were spasming, which indicates trauma to the neck. She complained of pain in her abdomen. Dr. Smith also testified that there was

evidence of rectal penetration, there was bruising and fecal material around her rectum, and there was trauma to the vaginal area. Dr. Smith explained that severe head trauma and being choked to the point of unconsciousness can cause a person to lose control of their bowels. Ms. Ward had a poor range of motion in her upper and lower extremities due to tenderness in those areas. The doctor said that the victim suffered bruising to her throat, chest, left shoulder, arm, thighs, rectum, and face, and the bruising to her face was accompanied by swelling. Dr. Smith testified that all of the victim's injuries were consistent with her explanation of how the Defendant attacked her. When the doctor was asked whether there was a substantial risk that Ms. Ward could have died during the assault and rape, Dr. Smith replied, "With the amount of trauma, she could have, yes." On cross examination, Dr. Smith said that the victim did not suffer any broken bones during the attack.

The victim's sister, Ashley Cupp, testified that, when the victim finally got home close to 4:00 a.m. on November 21, she was "bleeding from head to toe," wearing nothing but socks and a jacket, and screaming, "I'm alive." The victim had a black eye, her body was "all bruised up," and blood was "all over her face." Ms. Cupp ran to a neighbor's house, but no one answered the door. Therefore she drove to the home of Billy Butler, a police officer from whom she and Ms. Ward were renting their house, and called the police. Detective Butler testified that he did not get out of bed or respond himself because he was not on duty and he did not know that the problem had occurred at his rental property.

Detective Ray Stewart, Jr., an investigator with the Manchester Police Department, responded to Ms. Cupp's call. He testified that "it was obvious [the victim] had sustained an extensive beating." She had marks all over her face and hands, her eyes were swollen - one almost shut, her mouth was swollen, and she was very upset. Detective Mark Yother also testified that the victim had been "beaten very badly." He searched Ms. Ward's van and found her jogging pants, which were "soaked" with urine. He also found the Defendant's ring, watch, necklace, hat, and jacket. Detective Yother was at the victim's former residence when the Defendant called and left a message on which he said that "they needed to talk about what had happened last night" and asked the victim to page him. At the request of the police officers, Ms. Ward paged the Defendant; he called, and they agreed to meet in Cookeville. On the way there, the police officers spotted the Defendant and took him into custody.

Joe Miner, a forensic scientist with the Tennessee Bureau of Investigation, testified that the vaginal and anal swabs that were taken from the victim tested positive for the presence of semen. The sperm did not match a sample of DNA taken from the victim's boyfriend. Mr. Miner testified that he was not able to rule out the Defendant as a possible donor of the semen; however, he was also unable to say that it was, in fact, the Defendant's semen. He did testify that, statistically speaking, he was able to rule out 95 % of the world's Caucasian male population as potential donors based on his analysis of the vaginal swab. Based on his analysis of the anal swab, which was a more complete sample, he testified he could rule out 99.5 % of the population.

Douglas Coulter, the victim's ex-husband, testified on behalf of the Defendant. He stated that, on one occasion while they were married, he and Ms. Ward had a big fight. She hit him, and he hit her back. She responded by calling the police and got a restraining order against him.

Jared Genta, an acquaintance of the victim, testified for the Defendant that he attended a party at the victim's house shortly after the attack. He said that the victim had small "lesion" on her eye, but she otherwise appeared to be fine. They all drank and smoked marijuana, and Ms. Ward was kissing some man that she said was the Defendant's boss. On cross examination, Mr. Genta identified a photograph of the victim's former residence as the location of the party. However, at the time the party was supposed to have occurred, the victim no longer lived there, and it was completely empty.

Linda Genta, the Defendant's sister and friend of the victim, testified that Ms. Ward told her she was dating her landlord, Billy Butler. She also testified that Ms. Ward once told her how to fabricate evidence of spousal abuse in order to be granted full custody of children in a divorce action. In fact, Ms. Genta claimed to have seen the victim bruise herself by hitting herself in the cheek with a toothbrush holder. She also testified that the victim told her that anal sex was the best sex she had ever had because it afforded her "instant gratification," and she engaged in anal sex with the Defendant somewhat regularly while they were married.

Vickie Matthews, the Defendant's aunt, testified that the Defendant arrived at her house in Knoxville around 6:00 or 6:15 a.m. on the morning of November 21, 2000. She estimated that it would take three to three-and-one-half hours to go from Coffee County, where the crimes occurred, to her house in Knoxville. Ms. Matthews also testified that Ms. Ward once told her at a party how to obtain a favorable divorce. Ms. Ward advised her to bruise herself, act differently, and tell people that her husband had "grabbed" or "shoved" her, and she would get everything she wanted.

The Defendant also testified. He said that Ms. Ward was a heavy drinker and took Paxil. He also said that she violated the restraining order by calling him and coming around him. He testified that he engaged in anal sex with the victim while they were married, but it was never forced. The Defendant maintained that he was sick on November 19 and 20. On the night of the 20th, Ms. Ward came to his house. According to him, they engaged in oral sex, but no intercourse. Later in his testimony, he said that they did have sexual intercourse, but it was consensual. Later that night, he and Ms. Ward got into an argument over the custody of the children, and he told her to leave. He testified that he then "pushed" her out the door. She left her pager at his house. The Defendant also stated that he borrowed about fifty dollars from Ms. Ward, and he gave her his hat, jacket, necklace, watch, and ring as "collateral." Shortly after Ms. Ward left, the Defendant departed for Knoxville.

The Defendant specifically testified that he did not try to kill the victim; he merely pushed her out of his house. He also denied making any threats to her. Likewise, he denied taking her anywhere, and stated that he did not go to her house. He said that he did not rob her; he "borrowed" fifty dollars. Furthermore, he testified that he did not even know how to get to Monteagle. The Defendant opined that Ms. Ward brought these charges against him to gain an advantage over him

in their divorce. However, the State introduced as an exhibit their marital dissolution agreement, which was signed by both the Defendant and Ms. Ward on November 17, 2000, three days before the attack.

The State called the victim's former boss, Tammy Patterson, as a rebuttal witness. Ms. Patterson testified that the Defendant did violate the order of protection by calling and spying on Ms. Ward while she was at work. The Defendant's behavior frightened all the employees, and Ms. Patterson eventually had him arrested. She also testified that there was no relationship between Ms. Ward and Detective Billy Butler. Finally, she said that when the victim returned to work after the attack, she was scared and embarrassed, and she was "never the same person."

## SUFFICIENCY OF THE EVIDENCE

The Defendant's first issue is whether the evidence is sufficient to support his convictions for attempted second degree murder, aggravated spousal rape, especially aggravated kidnapping, aggravated robbery, and aggravated burglary. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

"Second degree murder is [a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A person attempts to commit second degree murder when, with the intent to commit second degree murder, that person takes "a substantial step toward the commission of the offense." Id. § 39-12-101(a)(3).

The evidence in this case showed that the Defendant beat Ms. Ward severely. Twice he choked her to the point that she lost consciousness. As he was choking her, he told her that he was going to kill her. Ms. Ward testified that, when she regained consciousness the second time in her van, she heard the Defendant talking to himself about where he would bury her. He expressed surprise that she was still alive. Furthermore, she testified that, the day before the attack, the Defendant sent her electronic pages that referred to her death. This evidence is sufficient to support the Defendant's conviction for attempted second degree murder.

Next, the Defendant challenges his conviction for aggravated spousal rape. "Aggravated spousal rape" is the unlawful sexual penetration of one spouse by the other where the defendant:

(A) Knowingly engaged in conduct that was especially cruel, vile and inhumane to the victim during commission of the offense; and either;

(B) Causes serious bodily injury to the victim; or

(C) Is armed with a weapon . . . .

Id. § 39-13-507(c)(1).

The Defendant argues that his conduct was neither cruel, vile, or inhumane, and he asserts that there is no evidence that the victim suffered serious bodily injury or that he employed a weapon during the rape. The State concedes that there is no evidence that, at the time of the rape, the Defendant was armed with a weapon.

First, we disagree with the Defendant that his conduct was not "especially cruel, vile and inhumane." The evidence showed that the Defendant got on top of the victim and choked her until she lost consciousness. When she regained consciousness, she discovered that the Defendant had removed her pants while she was unconscious. Then he proceeded to pull her up onto her knees. In the process, he threatened her and hit her several times in the head. The Defendant then forcefully engaged in anal sex with the victim, which resulted in the victim defecating on herself. Feces was found on the floor of the house where the rape occurred, and a photograph of such was made an exhibit at trial. The Defendant then rolled the victim onto her back, got on top of her, and choked her again until she lost consciousness. Dr. Smith testified that the victim's anus was bruised. The Defendant argues in his brief that his conduct of anally raping the victim cannot be deemed cruel because there was proof that he and the victim enjoyed anal sex while they were married. We are not persuaded that the fact that they engaged in anal sex during their marriage prevents the brutal rape of the victim from being characterized as "cruel, vile and inhumane." The argument is without merit. The facts in this case support a finding that the Defendant treated the victim in an "especially cruel, vile and inhumane" manner.

Furthermore, there is ample evidence that the Defendant caused the victim serious bodily injury. "'Serious bodily injury' means bodily injury which involves:

(A)  A substantial risk of death;
(B)  Protracted unconsciousness;
(C)  Extreme physical pain;
(D)  Protracted or obvious disfigurement;
(E)  Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty."

Id. § 39-11-106(a)(34).  Dr. Smith testified that there was a substantial risk that Ms. Ward could have died during the rape and the beatings.  In fact, the Defendant himself was surprised to learn that she had survived the ordeal.  Furthermore, Ms. Ward lost consciousness twice during the violent attack. The second time she remained unconscious long enough for the Defendant to strip her naked, load her into the back of her van, and begin his trip to Monteagle.  Finally, Ms. Ward testified about the extreme physical pain she suffered at the Defendant's hands.  She was unable to shower for days. She could not wash or brush her hair.  She had trouble urinating.  She testified that her "whole body hurt."  Therefore, there was a clear showing of serious bodily injury, and the evidence is sufficient to support the Defendant's conviction for aggravated spousal rape.

Next, the Defendant challenges his conviction for especially aggravated kidnapping, which our criminal code defines as false imprisonment that is accompanied by the use or display of a deadly weapon or where the victim suffers serious bodily injury.  See id. § 39-13-305(a)(1), (4).  "A person commits false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty."  Id. § 39-13-302(a).  The Defendant does not argue that he did not commit false imprisonment.  Rather, he argues that there was insufficient evidence that the victim suffered serious bodily injury or that he used or displayed a deadly weapon.  We have previously determined that there was ample evidence of serious bodily injury.  There was also evidence that the Defendant displayed a deadly weapon during the false imprisonment.  Ms. Ward testified that, in the van, the Defendant had a metal pipe with him that was "about two feet long" and "heavy," and the Defendant threatened to hit her with it.  Therefore, the evidence is sufficient to support the Defendant's conviction for especially aggravated kidnapping.

The Defendant was also convicted of aggravated robbery.  Aggravated robbery is the "intentional or knowing theft of property[1] from the person of another by violence or putting the person in fear," id. § 39-13-401(a), that is accompanied by the use or display of a deadly weapon or where the victim "suffers serious bodily injury."  Id. § 39-13-402(a).

Ms. Ward testified that the Defendant took her work pager and eighty dollars in cash that was in her pocket.  However, the Defendant testified that he merely "borrowed" money from her, and she left the pager at his house.  Therefore, he argues that he did not intend to deprive Ms. Ward of her property.  Nevertheless, the jury heard both the Defendant's and Ms. Ward's explanations, and obviously discredited the Defendant's testimony that he "borrowed" the money and intended to

---

[1]To commit the crime of theft of property, one must intend to deprive the owner of the property and knowingly exercise control over the property without the owner's consent.  See Tenn. Code Ann. § 39-14-103.

return the pager. This Court may not re-evaluate the jury's credibility determinations. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659.

The Defendant also argues that there is insufficient evidence that he took Ms. Ward's property by violence or force. Again, the jury obviously credited the testimony of Ms. Ward that the Defendant severely beat and choked her to the point of unconsciousness. When she recovered, she had been stripped of her clothes, and her money and pager were gone. Subsequently, the Defendant asked her to contact him on her pager, which was in his possession. This evidence is clearly sufficient to support the jury's finding that the Defendant took her property by violence or force.

The Defendant again asserts that there was no evidence of serious bodily injury that would justify a conviction for aggravated robbery. As we have already found that there was abundant evidence of the serious bodily injury inflicted on the victim by the Defendant, we need not again address this contention. The evidence is sufficient to support the aggravated robbery conviction.

Last, the Defendant was convicted of aggravated burglary. A person commits aggravated burglary who, without the consent of the property owner, enters or remains concealed in a habitation and either commits, attempts to commit, or intends to commit a felony, theft, or assault. See Tenn. Code Ann. §§ 39-14-402(a), 39-13-403(a).

The Defendant argues that the house he entered and remained concealed in for the purpose of attacking Ms. Ward was not a habitation because no one was living in the house at the time. This argument ignores the definition of "habitation" set forth in our criminal code, as well as our supreme court's opinion in State v. Langford, 994 S.W.2d 126, 127-28 (Tenn. 1999). A habitation is "any structure . . . which is designed or adapted for the overnight accommodation of persons." Tenn. Code Ann. § 39-14-401(1)(A). Clearly a house is "designed . . . for the overnight accommodation of persons." Id. Furthermore, our supreme court stated that, as of 1989, "[t]here is no longer a requirement that the structure be occupied." Langford, 994 S.W.2d at 128.

The Defendant also asserts that the State did not prove that he did not have the consent of the owner of the property to be in the house. "'Owner' means a person in lawful possession of property, whether the possession is actual or constructive." Tenn. Code Ann. § 39-14-401(3). Although she did not own the house, Ms. Ward was still in lawful possession of the property that she rented, as she was still in the process of moving into the new house. Ms. Ward specifically testified that she did not invite the Defendant to her house on the evening of the attack. Indeed, she had an order of protection which should have operated to keep the Defendant away from her. This evidence, along with all of the circumstantial evidence in this case regarding how the Defendant savagely beat and raped Ms. Ward, clearly shows that he did not have consent to enter her house, and the Defendant's argument to the contrary is meritless. The evidence is sufficient to support the Defendant's conviction for aggravated burglary, as well as his other four convictions. This issue is without merit.

**VIOLATION OF DOUBLE JEOPARDY**

The Defendant's second argument is that double jeopardy principles prohibit his multiple convictions for crimes that require proof of the element of serious bodily injury. The prohibition against double jeopardy embodied in the Fifth Amendment to the United States Constitution is applicable to the states through the Fourteenth Amendment[2] and protects criminal defendants from being "subject for the same offense to be twice put in jeopardy of life or limb."

In State v. Black, 524 S.W.2d 913 (Tenn. 1975), our supreme court adopted the Blockburger test for determining when to sustain multiple convictions which are based upon the same acts or transactions. See Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). The broad question is whether the offenses at issue constitute the same offense under the double jeopardy clause. The court in Black held that multiple convictions do not violate double jeopardy if "the statutory elements of the two offenses are different, and neither offense is included in the other." Id. at 920 (citing Iannelli v. United States, 420 U.S. 770, 95 S. Ct. 1284, 43 L. Ed. 2d 616 (1975)). The Blockburger test requires that "courts examine the offenses to ascertain 'whether each [statutory] provision requires proof of a fact which the other does not.'" Iannelli, 420 U.S. at 786 (quoting Blockburger, 284 U.S. at 304). According to Blockburger, "[a] single act may be an offense against two statutes." 284 U.S. at 304.

In this case, each of the three crimes that contain the element of serious bodily injury of which the Defendant was found guilty requires the proof of a fact that the others do not.[3] While aggravated spousal rape requires proof of serious bodily injury, it also requires proof of sexual penetration. See Tenn. Code Ann. § 39-13-507(c)(1). Likewise, especially aggravated kidnapping may be proven by evidence of serious bodily injury, but it also requires that the defendant falsely imprison the victim. See id. § 39-13-305(a). Finally, a robbery is aggravated where the victim suffers serious bodily injury, see id. § 39-13-402(a), but it also requires a theft. See id. § 39-13-401(a). Therefore, although serious bodily injury is an element of each crime, each of the crimes requires proof of an additional element that the others do not. Consequently, the fact that the State relied upon the severe beating and choking of the victim to satisfy the serious bodily injury requirement of all three crimes, as well as to obtain the conviction for attempted second degree murder, does not violate double jeopardy protections. This issue is without merit.[4]

---

[2] See Malloy v. Hogan, 378 U.S. 1, 6, 84 S. Ct. 1489, 1492, 12 L. Ed. 2d 653 (1964).

[3] The Defendant seems to argue that the element of serious bodily injury also applies to his conviction for attempted second degree murder. While the injuries inflicted upon Ms. Ward would certainly satisfy the element of a "substantial step" that is required, see Tenn. Code Ann. §39-12-101(a)(3), serious bodily injury itself is not an element of attempted second degree murder. Furthermore, attempted second degree murder contains an element that the other crimes of which the Defendant was convicted do not: the intent to commit second degree murder. See id.

[4] Within his argument of this issue, the Defendant presents a sub-argument that, under State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), his other four convictions were incidental to the crime of attempted second degree murder and, therefore, should be reversed. As the Defendant failed to raise this argument in his motion for a new trial, it is waived. See Tenn. R. App. P. 3(e). Even if not waived, the issue has no merit.

-10-

## EVIDENCE OF PRIOR BAD ACTS

The Defendant's third issue is whether the trial court erred by admitting evidence of his prior bad acts of violating the order of protection that Ms. Ward took out against him. The Defendant failed to register a contemporaneous objection to the admission of this evidence, and he failed to raise the issue in his motion for a new trial. Therefore, the issue is waived. See Tenn. R. App. P. 3(e), 36(a).

## STATE'S FAILURE TO PRODUCE EVIDENCE

Fourth, the Defendant complains that he was prejudiced by the State's failure to produce his underwear and the metal pipe with which he threatened the victim. He contends that this failure on the part of the State prejudiced him because there was a possibility that, upon inspection, this evidence might have yielded exculpatory evidence. The Defendant waived this issue by failing to include it in his motion for a new trial. See Tenn. R. App. P. 3(e).

## DEPRIVATION OF A FAIR TRIAL

The Defendant's final argument is that the cumulative effect of all the trial errors denied him a fair trial. Having found no errors, we conclude that this issue is without merit.

Accordingly, the judgments of the trial court are affirmed.

 

_____
DAVID H. WELLES, JUDGE

-11-